Laura Henrie (Bar No. 12449)
Nate Crippes (Bar No. 14622)
Michelle C. Marquis (Bar No. 16889)
Katie Cox (Bar No. 17188)
Maya Anderson (Bar No. 17559)
**DISABILITY LAW CENTER**
205 North 400 West
Salt Lake City, Utah 84103
Telephone: 800.662.9080
Email: lhenrie@disabilitylawcenter.org
          ncrippes@disabilitylawcenter.org
          mmarquis@disabilitylawcenter.org
          kcox@disabilitylawcenter.org
          mvanderson@disabilitylawcenter.org

*Attorneys for Plaintiffs*

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| KRISTIN JACOBS, legal guardian of E.J.; AMANDA SANDY, legal guardian of H.S.; AND DISABILITY LAW CENTER, a Utah nonprofit corporation, <br><br> Plaintiffs, <br><br> vs. <br><br> SALT LAKE CITY SCHOOL DISTRICT; and BOARD OF EDUCATION OF SALT LAKE CITY SCHOOLS, <br><br> Defendants. | **FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** <br><br> **JURY DEMAND** <br><br> Case No. 2:21-cv-00706-JNP <br><br> Judge Jill N. Parrish |

Plaintiffs E.J. and H.S., by and through their parents and legal guardians Kristin Jacobs and

Amanda Sandy, respectively, and Plaintiff Disability Law Center (the "DLC") hereby complain of

Defendants Salt Lake City School District and Board of Education of Salt Lake City Schools (collectively "Defendants"), and allege as follows:

## I.    <u>INTRODUCTION</u>

1.      This case is about Salt Lake City School District's ("SLCSD" or "the District") purposeful exclusion of students with disabilities from their neighborhood schools, and the segregation of those students in "hub" schools, far from their family, neighbors, and friends, and in contravention of several federal laws.

2.      The Plaintiffs are two school-age children with disabilities, E.J. and H.S., and the Disability Law Center, Utah's Protection and Advocacy Agency.

3.      Both E.J. and H.S. want to attend their neighborhood schools and receive the special education services they are entitled to.

4.      But for the District's discriminatory policy, both E.J. and H.S. could be served in their neighborhood schools with appropriate supports and services.

5.      However, without considering their individualized needs, Defendants instituted a blanket policy requiring E.J., H.S., and other students with disabilities in the District, to choose between their neighborhood school and the special education services to which they are legally entitled.

6.      Plaintiffs E.J. and H.S. have intellectual disabilities and/or cognitive impairments.

7.      They are eligible to receive special education services individualized to their needs under the Individuals with Disabilities Education Act ("IDEA").

8.      Because of the discriminatory way in which SLCSD administers its educational service system, E.J. and H.S. are denied the opportunity, and individualized assessment necessary, to attend their neighborhood school with the special education services they require.

9.      Students without intellectual disabilities or cognitive impairments routinely attend the school within their geographic boundary along with their siblings, friends, and neighbors.

10.     Students without intellectual disabilities or cognitive impairments do not have to demonstrate that they will be successful academically in order to attend their neighborhood school.

11.     Students without intellectual disabilities or cognitive impairments are able to access the appropriate accommodations at their neighborhood school.

12.     SLCSD has 27 elementary schools within its boundaries.

13.     Students without intellectual disabilities or cognitive impairments are allowed to attend any of the 27 schools that fall within their geographic boundary.

14.     Utah law also allows students who reside outside of any school district to transfer into any other school that has sufficient enrollment space. Utah Code Ann. § 53G-6-402(2).

15.     This law allows students to choose to attend the school that is the best fit for the student's needs so long as sufficient space is available.

16.     Unlike their nondisabled peers, Plaintiffs are unable to choose to attend the school that best fits their needs, regardless of the enrollment numbers.

17.     SLCSD has assigned Plaintiffs to a category based on the severity of their disabilities and their need for accommodations in the classroom.

18.     SLCSD has further assigned those students to certain "hub" schools based on that categorical designation.

19.     It is this categorical designation, rather than the Plaintiffs individual needs, that determines what school they are able to attend.

## II.     **JURISDICTION AND VENUE**

20.     This action is brought pursuant to Title II of the Americans with Disabilities Act, as Amended, 42 U.S.C. § 12132 *et seq.*, the Rehabilitation Act, 29 U.S.C. § 794, and the IDEA, 20 U.S.C. § 1415(i)(2)(A-C). This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 because this action concerns claims arising under federal law.

21.     Plaintiffs' claims asserted herein arose in Utah and Defendants are local governmental entities in Utah.

22.     The Court may grant the relief sought by Plaintiffs pursuant to 28 U.S.C. §§ 2201-2202, 42 U.S.C. § 12133, 29 U.S.C. § 794a, 20 U.S.C. § 1415(i)(2-3), and Rules 57 and 65 of the Federal Rules of Civil Procedure.

23.     Venue in this judicial district is proper under 28 U.S.C. §§1391(b)(1)-(b)(2) in that this is the judicial district in which Defendants reside and this is the judicial district in which a substantial part of the events and/or omissions at issue occurred.

## III.     **EXHAUSTION OF ADMINISTRATIVE REMEDIES**

24.     To the extent that the named Plaintiffs were required to exhaust their administrative remedies with regard to the claims brought in this Complaint, the following is a recitation of that procedure:

25.     The exhaustion requirement in the IDEA requires that IDEA claims, or claims that could be framed as IDEA claims, be exhausted at the administrative level before a case is filed in federal court.

26.     Utah is a "one-tier" state with regard to IDEA exhaustion. In "one-tier" states, the state department of education conducts the due process hearing and the losing party can appeal to state or federal court. In states with a "two-tier" system, there is an opportunity for state-level appeal/review following the due process hearing decision before moving to federal court; Utah is not such a state. Unlike in a "two-tier" system, there is no additional step available for review in a "one-tier" system. Following a due process hearing in Utah, the only next step in the appeal process is to file a civil action in state or federal court.

27.     Courts have recognized exceptions to the exhaustion requirement including where an identifiable uniform systemwide policy is enforced at the highest administrative level or when exhausting through the administrative process is futile because a hearing officer cannot order the relief sought.

28.     This Complaint is not limited to the IDEA, and includes claims brought under other Federal laws protecting the rights of children with disabilities, including Title II of the Americans with Disabilities Act as amended and the Rehabilitation Act, which do not require exhaustion.

29.     E.J.'s Prior Written Notice ("PWN") provided by the District incorporated USBE's Procedural Safeguards Notice which contain a full description of the procedural safeguards available under the IDEA; no other notice or process was provided.

30.     H.S.'s PWN provided by the District incorporated USBE's Procedural Safeguards Notice which contain a full description of the procedural safeguards available under the IDEA; no other notice or process was provided.

31.     The exclusive process offered by the District to E.J. and H.S. was IDEA dispute resolution through the procedural safeguards afforded under that statute.

A.      **E.J.**

32.     Plaintiff E.J. filed a Request for Due Process Hearing with the Utah State Board of Education on March 4, 2021. E.J. alleged violations of the IDEA and the ADA on behalf of herself as well as similarly situated students.

33.     In a preliminary Order on March 23, 2021, the Hearing Officer dismissed E.J.'s ADA claims as well as those on behalf of similarly situated students citing a lack of jurisdiction.

34.     A formal hearing was held from September 13-16, 2021, on E. J.'s individual IDEA claims.

35.     During the hearing when the District's service delivery consolidation, or "hub" system, was raised, including in relation to E.J.'s suitability to attend her neighborhood school and the consolidation's effect on other children, the District objected and attempted to limit the scope of the questioning to E.J. only.

36.     During the hearing when the District's service delivery consolidation, or "hub" system, was raised, including in relation to E.J.'s suitability to attend her neighborhood school and the consolidation's effect on other children, the Hearing Officer narrowed the scope of questions and witness testimony to E.J. only.

37.     On November 10, 2021, the Hearing Officer issued a formal decision and found against E.J. on each of her IDEA claims and also reaffirmed dismissal of E.J.'s ADA claims as well as those on behalf of similarly situated students.

38.     The Hearing Officer's decision is final, and E.J. has no additional opportunity for administrative review.

39.     E.J. is aggrieved as a result of this decision, and her parents, on her behalf, wish to pursue this civil action.

40.     E.J. hereby appeals the administrative decision and asserts additional claims through this civil action.

**B.**     **H.S.**

41.     Plaintiff H.S. filed a Request for Due Process Hearing with the Utah State Board of Education on September 17, 2021. H.S. alleged violations of the IDEA and the ADA on behalf of himself as well as similarly situated students.

42.     On October 7, 2021, the Hearing Officer, sua sponte, requested formal briefing on the issue of whether or not H.S.'s parents had properly consented to special education services under 34 C.F.R. §300.300(b)(3)(i-iii) of the IDEA.

43.     The parties submitted simultaneous briefing on October 27, 2021.

44.     On November 1, 2021, the Hearing Officer ordered Summary Judgment for the Defendants, making a factual determination that H.S.'s parents had not properly consented to special education services, and that he was therefore not entitled to continue to a due process hearing.

45.     The Hearing Officer's decision is final, and H.S. has no additional opportunity for administrative review.

46.     H.S. is aggrieved as a result of this decision, and his parents, on his behalf, wish to pursue this civil action.

47.     H.S. hereby appeals the administrative decision and asserts additional claims through this civil action.

IV.    **PARTIES**

    A.    **Plaintiffs**

        1.    **E.J.**

48.    E.J. is a warm and outgoing 12-year-old who currently attends Emerson Elementary ("Emerson") in Salt Lake City School District.

49.    E.J. has a diagnosis of Williams syndrome, a rare genetic syndrome that involves the deletion of genes in chromosome 7, the size of which can vary.

50.    E.J. is enrolled in Sixth grade at Emerson for the 2021-22 school year and receives special education and related services under the eligibility classification "Other Health Impairment."

51.    Despite strong age-appropriate social skills, sufficient progress being made on IEP goals over a period of years, an absence of problematic behavior, and the ability to be successful with appropriate supplementary aids and services, the District has refused to consider placing E.J. at her neighborhood school.

52.    E.J. has been separated and placed in a different school than she would attend if she did not have a disability, and in separate and special education-only classes, based on nothing more than the severity category and associated group program to which SLCSD has assigned her.

        2.    **H.S.**

53.    H.S. is a cheerful and friendly 11-year-old student currently attending fifth grade at Bonneville Elementary ("Bonneville") in Salt Lake City School District .

54.     H.S. has a diagnosis of Down syndrome, also known as trisomy 21, a genetic syndrome which is associated with intellectual disability, abnormal physical development, and gastrointestinal and muscular disorders.

55.     The Sandys registered H.S. in SLCSD in March 2019, intending for H.S. to start third grade at Bonneville, his neighborhood school, in the fall of 2019.

56.     H.S. began attending Bonneville in August 2019. At the Eligibility meeting on September 18, 2019, the Sandys learned that the District was unwilling to serve H.S. at his neighborhood school. The IEP team informed the Sandys that H.S. would be required to move to Highland Park Elementary ("Highland Park") to attend "Essential Elements," a self-contained special class for students with "severe" disabilities, on the sole basis that this was the only option available to students categorized as "severe" under the hub plan.

57.     Even before H.S.'s IEP was fully developed, SLCSD had already determined that H.S. belonged in a self-contained "Essential Elements" class. When the Sandys objected to the more restrictive placement, SLCSD terminated the limited services H.S. had been receiving. This removal occurred before H.S. had a chance to demonstrate his ability to succeed in the regular education environment with the aid of any individualized supports or services.

58.     As a result, H.S. is currently attending Bonneville with no special education services.

59.     Accordingly, the District has insisted on placing H.S. at a different school than he would attend if he did not have a disability, and in separate and special education-only classes, based purely on the severity category and associated group program which SLCSD has assigned him.

### 3.      The Disability Law Center

60.     Plaintiff DLC is a non-profit corporation, and has been designated by the Governor of the State of Utah as the state's protection and advocacy "("P&A") system. The DLC is a federally authorized and funded organization established under the Protection and Advocacy for Individuals with Developmental Disabilities Act ("PADD"), 42 U.S.C. §15041, *et seq*. Under the leadership of its governing board, the DLC advocates for and protects the legal rights of people with disabilities, including individuals with developmental disabilities, across the state of Utah. The DLC consults with individuals with disabilities and their family members in identifying organizational priorities. The DLC accomplishes this by reserving space on its governing board for such individuals, providing a formal grievance process, and ensuring opportunities for public comment.

61.     As the designated P&A system for the state of Utah, the DLC is authorized by Congress to "pursue legal, administrative, and other appropriate remedies or approaches to ensure the protection of, and advocacy for, the rights of [individuals with developmental disabilities] within the State who are or who may be eligible for treatment, services, or habilitation." 42 U.S.C. § 15043(a)(2)(A)(i).

62.     The DLC advocates for and protects the legal rights of people with developmental disabilities, which includes intellectual disabilities and/or cognitive impairments.

63.     The DLC has frequently exercised its statutory authority to bring suit challenging laws and practices that harm Utahns with disabilities. *See*, *e.g.*, *Disability Law Center v. Utah*, No. 2:15-cv-00645-RJS (D. Utah Sept. 8, 2015) (bringing class-action suit to bar state entities from forcing vulnerable criminal defendants with mental illness to languish in jail while waiting months

for transfer to the Utah State Hospital); *Disability Law Center et al. v. Utah et al.*, No. 2:17-CV-748 (D. Utah July 6, 2017) (bringing suit to enjoin a state law that allowed courts to waive counsel for disabled adults in guardianship proceedings with their parents involving estates of less than $20,000); *Christensen v. Miner*, No. 2:18-cv-0037 (D. Utah Jan. 12, 2018) (bringing class-action suit to prevent the State from administering its Medicaid program in a discriminatory and segregated way and to ensure that Plaintiffs and similarly situated persons received necessary services in the most integrated setting appropriate to their needs).

64.     The DLC advocates on behalf of its constituents, and specifically the almost 89,000 students with disabilities who need or utilize special education services in Utah. The DLC receives approximately 4,000 requests for assistance each year from Utahns with disabilities. In fiscal year 2021, the DLC's dedicated special education legal team provided individual education advocacy to 168 clients throughout the state of Utah.

65.     The DLC has worked with parent advocacy groups and legislative partners to combat the need to segregate and hub services for children with disabilities.

66.     The DLC has been contacted by multiple families in SLCSD, apart from the individual Plaintiffs, expressing concern over the District's hub plan and its negative impact on their children. These concerns are borne out of the District's segregation of students with intellectual and development disabilities.

67.     These DLC constituents, who have been harmed by the District's policy, have the right to bring individual claims challenging the policy under federal law.

68.     The DLC's 18-member elected governing board is knowledgeable of the needs of individuals with developmental disabilities. The governing board is composed of family members

of people with developmental disabilities, attorneys, advocates, and other interested and knowledgeable persons from the community. The DLC is closely connected to the interests of those it serves.

69.     The DLC represents its constituents, students with developmental and intellectual disabilities, who need or utilize special education services who cannot receive appropriate educational services due to Defendants' discriminatory hub plan. DLC's constituents are SLCSD students who are similarly situated to E.J. and H.S.

70.     The DLC joins this action as an entity that has suffered a distinct economic injury as it has had to expend significant personnel time and financial resources to advocate for the rights of students to receive appropriate special education services in an integrated setting. The DLC has been injured by the District's conduct because their actions required the expenditure of resources to confirm the discriminatory conduct of the District. This required investigation and engagement with administrative processes, including retaining experts, which required use of the limited financial and personnel resources with which the DLC operates. If the District had not been engaged in discriminatory conduct, those resources could have been used to more fully facilitate the DLC's mission to improve educational opportunities for students with disabilities throughout Utah.

### B.     Defendants

#### 1.     Salt Lake City School District

71.     Defendant SLCSD is a public school district, providing educational services to children in the state of Utah.

#### 2.     Board of Education of Salt Lake City Schools

72.     Defendant Board of Education of Salt Lake City Schools ("SLCSD School Board") leads and directs the actions, policies, and practices of SLCSD and consists of seven elected members. The SLCSD School Board is, and was at all times material hereto, charged with the supervision, control, and management of all matters relating to the public schools within SLCSD boundaries. SLCSD School Board is a public entity subject to the ADA and a recipient of federal funds subject to the Rehabilitation Act. SLCSD School Board is a "body corporate" as defined by Utah statute, and may sue and be sued. U.C.A. §53G-4-401(4).

## V.     APPLICABLE STATUTORY PROVISIONS

### A.     The Americans with Disabilities Act

73.     The ADA was enacted in 1990 "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities[.]" 42 U.S.C. § 12101(b)(1).  In enacting the ADA, Congress found that "historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem[.]" 42 U.S.C. § 12101(a)(2).

74.     In addition, Congress recognized that "people with disabilities, as a group, occupy an inferior status in our society, and are severely disadvantaged socially, vocationally, economically, and educationally; [and] the Nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, independent living, and economic self-sufficiency for such individuals[.]" 42 U.S.C. § 12101(a)(6)-(7).

75.     Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services,

programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. It applies to public entities, including state or local governments and any departments, agencies, or other instrumentalities of state or local governments such as the Defendants identified herein. 42 U.S.C. §§ 12131, 12132.

76.     Title II's implementing regulations prohibit public entities, including Defendants, from utilizing "criteria or methods of administration" that "have the effect of subjecting qualified individuals with disabilities to discrimination," or "[t]hat have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities[.]" 28 C.F.R. § 35.130(b)(3)(i), (ii).

77.     The "integration mandate" of Title II requires Defendants to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). This includes educational programs and services. "The most integrated setting" is one that "enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible." 28 C.F.R. § Pt. 35, App. B.

**B.      Section 504 of the Rehabilitation Act of 1973**

78.     The Rehabilitation Act ("Rehab Act") prohibits discrimination against people with disabilities under any program or activity that receives federal financial assistance, such as IDEA funding. 29 U.S.C. § 794(a).

79.     The Rehab Act's implementing regulations prohibit recipients of federal funding from using "criteria or methods of administration" that have the effect of subjecting qualified persons with disabilities to discrimination on the basis of disability, or that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the recipient's

program with respect to persons with disabilities. 28 C.F.R. § 41.51(b)(3)(i)-(ii); 45 C.F.R. § 84.4(b)(4)(i)-(ii).

80.    These implementing regulations also require entities receiving federal funding to "administer programs and activities in the most integrated setting appropriate to the needs of qualified . . . persons [with disabilities]." 28 C.F.R. § 41.51(d); *see also*, 45 C.F.R. § 84.4(b)(2).

### C.    Individuals with Disabilities Education Act

81.    Under the IDEA and its implementing regulations, school districts must afford children with disabilities "a free and appropriate public education" ("FAPE") which is defined as "special education and related services that (a) are provided at public expense, under public supervision and direction, and without charge; (b) meet the standards of the State Educational Agency; (c) include an appropriate preschool, elementary school, or secondary school education in the State involved; and (d) are provided in conformity with the individualized education program ("IEP") that meets the requirements of §§ 300.320 through 300.324." 34 C.F.R.§300.17.

82.    The Least Restrictive Environment ("LRE") requirement under the IDEA requires each school district to ensure that "[t]o the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are non-disabled; and special classes, separate schooling, or other removal of children with disabilities from the regular education environment occurs only if the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 34 C.F.R. §300.114 (a)(2).

83.    The IDEA states that placement decisions must be made in conformity with the LRE requirement, and must be determined on an individual basis based on the child's IEP. 34

C.F.R. §300.116(a)(2) and (b)(2). Each school district must make available a continuum of alternative placements, or a range of placement options, to meet the needs of children with disabilities for special education and related services. 34 C.F.R. §300.115. These options, which include regular classes, special classes, separate schools, or instruction in hospitals and institutions, must be made available to the extent necessary to implement each child's IEP. 34 C.F.R. §300.115. In determining placement, the first consideration should be given to placements that are in regular classes with the provision of the supplementary aids and services that the child needs. A child with a disability may not be removed from education in age-appropriate regular classrooms solely because of needed modifications in the general curriculum. 34 C.F.R. 300.116(e).

84.     The IDEA requires that each child's placement is determined at least annually, is based on his or her IEP, and is in the school or facility as close as possible to the child's home. 34 C.F.R. §300.116(b)(1)-(3). The regulations also provide that "[i]n selecting the least restrictive environment, consideration is given to any potential harmful effect on the child or on the quality of services that he or she needs." 34 C.F.R. §300.116(d). Further, each child must be educated in the school that he or she would attend if not disabled, unless the child's IEP requires another arrangement. 34 C.F.R. §300.116(c).

85.     Finally, placement decisions may not be solely based "on factors such as category of disability, severity of disability, availability of special educational and related services, configuration of the service delivery system, availability of space, or administrative convenience." 71 Fed. Reg. 46588 (Aug. 14, 2006). Rather, placement decisions must be made on an individual basis in light of applicable LRE requirements.

## VI.    GENERAL ALLEGATIONS

### A.    E.J.

86.    As noted above, E.J. is a warm and outgoing 12-year-old with a diagnosis of Williams syndrome who currently attends sixth grade at Emerson Elementary.

87.    Williams syndrome is characterized by medical problems, including cardiovascular disease, developmental delays, and learning challenges. These often occur side by side with striking verbal abilities, highly social personalities, and an affinity for music. In general, students with Williams syndrome learn best with repetition, consistency, structured instructional routines, clear and realistic expectations, social stories, scripts and visual schedules, and technology.

88.    Because E.J.'s deletion of genes in chromosome 7 is shorter, she experiences fewer serious medical conditions and is more advanced than a typical child with Williams syndrome. E.J. struggles with visual-spatial functioning, including depth perception, and receives treatment for a cardiovascular condition.

89.    E.J. enrolled in SLCSD in 2014, where she was almost immediately categorized as "mild/moderate" due to the cognitive nature of her disability and the District determined that her services must be delivered in a special class. E.J. has since been moved to four different schools; each time, it was because she had been assigned to the correlating self-contained classroom at the designated school with a small group of same-age peers.

90.    At no time prior to placing E.J. in a special class did the District consider her participation in general education in the school she would have attended if not disabled with special education services.

91.     In the Spring of 2019, SLCSD announced that it would be consolidating educational services for "mild/moderate" students to three "hub" elementary schools. SLCSD refers to the program for "mild/moderate" students as "Academic Support." E.J.'s parents were concerned that E.J. would be forced to move schools again and that the new system would only serve to further isolate E.J. from her non-disabled peers.

92.     In May of 2019, E.J.'s parents met with the District two times. E.J.'s parents were informed by the individualized education plan ("IEP") team that E.J. would be moving to Emerson with her "Academic Support" class in the Fall of 2019.

93.     At the time of the meeting, the District had already determined that all "Academic Support" students would be moving to a consolidated hub school, including E.J., and E.J.'s specific needs were not discussed or considered with regard to that decision.

94.     E.J.'s parents requested that E.J. have the opportunity to attend Dilworth Elementary ("Dilworth") instead of Emerson. Dilworth is E.J.'s neighborhood school, and attendance there would have allowed E.J. to attend school with those children in her neighborhood as well as with her sibling. E.J. had not been allowed to attend Dilworth for the previous two years because she had been placed in a self-contained classroom at a different school, Indian Hills Elementary ("Indian Hills"), based on her disability category.

95.     E.J.'s parents were told that E.J. required "Academic Support" and had to move to Emerson if they wanted her to continue to receive full special education services; otherwise, she would have her services reduced or removed.

96.     The explanation provided by the Special Education Director, Shelley Halverson ("Ms. Halverson"), intimated that the location determines the services, not the IEP team or individualized consideration of the student.

97.     At the May 7, 2019 meeting, Ms. Halverson also stressed that, at Emerson, E.J.'s teachers would be following a more inclusive model than was used at E.J.'s previous schools.

98.     Specifically, Ms. Halverson told E.J.'s parents that once she moved to Emerson, she would no longer be placed in a standard self-contained classroom; instead, she would participate in a "blended class" model, spending some of her time in a self-contained "Academic Support" classroom and the rest in a "collaborative classroom."

99.     E.J.'s parents opposed the move from Indian Hills to Emerson, but because they did not want E.J. to receive reduced services, they eventually enrolled her at Emerson in compliance with the consolidated hub plan.

100.    As a result of implementation of the hub plan, E.J.'s time spent on the bus significantly increased.

101.    At the IEP meeting in May 2020, E.J.'s parents discovered that for most of Fourth grade (2019-2020), SLCSD had not fully implemented the "collaborative classroom" model at Emerson as promised.[1]

---

[1] E.J.'s experience at Emerson has not been unique. In a presentation to parents by SLCSD as recently as February 24, 2021, facilitated by the Utah Parent Center, Ms. Halverson acknowledged that the collaborative classroom model had not fully been implemented at the "hub schools" due to staffing and financial constraints, and that the new "hub school" system had not actually resulted in students being educated in the LRE. (*Q&A with SLC Special Education Director, Shelley Halverson, Utah Parent Center* (Feb. 24. 2021) (downloaded using Zoom link)). In fact, when asked why students at the "hub schools" couldn't receive comparable special education services in their neighborhood schools, Ms. Halverson indicated that SLCSD would work toward having students "graduate" from the "mild/moderate" and "severe" classes so they could return to their neighborhood schools in the future.

102.     At the IEP meeting the following year, E.J.'s parents learned that, during the 2020-2021 school year, E.J. was educated in a fully immersive combined collaborative classroom where she spent all of her time with her nondisabled peers, receiving instruction from a general education teacher in all of her academic subjects.

103.     E.J.'s parents want her to experience regular school life, and they made this position known to SLCSD. E.J. has been with the same small group of students since Preschool, and her social experiences have been severely limited by restricting these 6-8 students to one small class.

104.     Over time, E.J. has been and continues to be negatively impacted by maladaptive modeling by classmates in her self-contained program, including bullying, which has been detrimental to E.J. in the past.

105.     Were it not for the District's discriminatory policy, E.J. would not be forced to start school so early, would have less time on the bus, and would be able to share in the experience of walking home from school with her sister and neighborhood friends.

106.     If E.J. were given the opportunity to be in an inclusive environment in her neighborhood school, the experience would be enhanced because she would have access to nondisabled peers who are part of her community. Additionally, E.J. would not be negatively impacted by maladaptive modeling by classmates in her self-contained program, which has been detrimental to E.J. in the past. Further, E.J. would have the opportunity escape the bullying she has been subjected to by one of her classmates.

107.     While E.J.'s IEP is designed to provide individualized supports that can be delivered in a general education classroom by a general educator with consultative or collaborative supports, the District instead focuses on delivery via a group "program." This decision has not

been based on E.J.'s instructional need, and the District's stated reasons of untrained staff, lack of space, and type or severity of E.J.'s disability are not appropriate reasons for removal from the general education setting in her neighborhood school.

108.    Despite demonstrated success in her collaborative co-taught classroom, E.J. is not being given the opportunity to attend her neighborhood school with appropriate supports and services, and any opportunity to increase time in general education settings is only available at a hub school.

109.    There is no justification to support SLCSD's decision to deny E.J. an opportunity to receive special education services in a general education class with her non-disabled peers at her neighborhood school.

**B.    H.S.**

110.    As noted above, H.S. is a cheerful and friendly 11-year-old with a diagnosis of Down syndrome who currently attends fifth grade at Bonneville Elementary.

111.    Although virtually all individuals with Down syndrome exhibit some degree of intellectual disability, each individual's level of impairment in various areas fall along a broad spectrum; as such, it is impossible to reduce all of this diversity of skills, experience, and personality down to a universal model.

112.    For students with Down syndrome to reach their full potential, it is imperative that teachers make a consistent effort to learn and understand the strengths and weaknesses of each individual student, rather than adopt a "one-size-fits-all" approach based on stereotypes and preconceived notions of what individuals with Down syndrome are capable of.

113.    Individuals with Down syndrome often demonstrate strong social and interpersonal skills despite the obstacles to communication they may experience, and like all children, they thrive in environments where they have the opportunity to engage in meaningful interactions with others and to develop a sense of community and belonging.

114.    Prior to the 2019-20 school year, H.S. attended an alternative private school known as the "Children's Synergistic Learning Collective" ("CSLC"), where he participated in a blended classroom with disabled and nondisabled students. This resulted in a learning environment where H.S. had the opportunity to engage in meaningful social interactions and participate fully as a valued member of his community; he was never separated from other students or treated differently in any way as a result of his Down syndrome.

115.    H.S. thrived in his blended class at CLSC, and the Sandys anticipated that he would be provided with the same opportunity for inclusion at SLCSD.

116.    When the Sandys challenged the proposed move to "Essential Elements," the District reiterated that special education services would only be offered if they agreed to the more restrictive placement. Further, if the Sandys refused to agree to the placement, SLCSD would not provide any special education services to H.S.

117.    The District offered no individualized justification for its decision to require H.S. to attend self-contained classes at a different school than he would attend if not disabled, except by circularly referring back to the severity category which SLCSD has assigned him without reference to his individual needs.

118.    Bonneville is H.S.'s neighborhood school, and remaining there would allow H.S. to attend school with his siblings and other children in his neighborhood; requiring him to attend

a non-neighborhood school in order to receive services would greatly limit these social experiences and distance him from the other children in his community.

119.    At no point did the District consider whether or how "Essential Elements" would adequately address the full spectrum of H.S.'s needs, nor how this more restrictive placement might affect his ability to interact with typically developing peers. Nonetheless, the Sandys were told that H.S. had to move to Highland Park if they wanted him to receive special education services; otherwise, all services would cease.

120.    Experts directly caution against denying students like H.S. the opportunity to participate with nondisabled peers in general education settings and activities merely because their academic performance falls below the level expected of a typically developing student. Students such as H.S. who have relatively well-developed social skills and an absence of challenging behaviors can and do benefit from interaction with and modeling of age-appropriate social and behavioral skills by peers, and this serves them well in the post-education world.

121.    Further, H.S. performs at the "mild" or "moderate" range across the three areas used to evaluate intellectual disability and does not demonstrate performance in any domain in the severe or profound range.

122.    SLCSD's determination that H.S. belongs in a classroom reserved for students with "severe" disabilities not only fails to consider all the potential benefits and detriments of a removal from the general education environment but is also entirely inconsistent with H.S.'s actual level of performance when examined at the individual level. Despite this, the District refuses to consider offering services in a less restrictive placement more suited to H.S.'s unique circumstances.

123.     Every justification SLCSD offers for its decision to place H.S. in a self-contained class at a hub school ultimately rests on the configuration of its existing service delivery model: H.S. supposedly requires a "severe" classroom because he has been deemed a "severe" student, and "severe" classrooms only exist at hub schools. The decision to reassign H.S. to a self-contained classroom constitutes an attempt to fit H.S. into the inflexible, pre-existing structure of SLCSD's group programs, rather than a genuine effort to provide him with an individualized education.

C.       **SLCSD's Educational Service System Discriminates Against Children with Intellectual Disabilities and/or Cognitive Impairments**

124.     SLCSD administers the provision of special education services to students who are eligible to receive such services under the IDEA.

125.     SLCSD must administer these services in compliance with the IDEA, ADA, and Rehab Act.

126.     Students with disabilities who qualify for services under the IDEA are entitled to receive specially designed instruction, supplementary aids and services, and related services.

127.     Specially designed instruction is defined as "adapting, as appropriate to the needs of an eligible child under this part, the content, methodology or delivery of instruction (i) to address the unique needs of the child that result from the child's disability; and (ii) ensure access of the child to the general curriculum, so that the child can meet the educational standards within the jurisdiction of the public agency that apply to all children." 34 C.F.R. §300.39(b)(3).

128.     Supplementary aids and services are defined as "aids, services, and other supports that are provided in regular education classes, other education-related settings, and in extracurricular and nonacademic settings, to enable children with disabilities to be educated with

nondisabled children to the maximum extent appropriate in accordance with §§300.114 through 300.116." 34 C.F.R. §300.42.

129.    Practical examples include the provision of aides or paraeducators, modified curriculum, strategies to reduce distractions and provide organization and help attending to tasks, direct services and supports to the child, and support and training for staff who work with the child.

130.    Related services can include physical therapy, occupational therapy, and speech language pathology services.

131.    On information and belief, SLCSD provides special education services to children at each of its 27 elementary schools.

132.    However, for children with intellectual disabilities or cognitive impairments, SLCSD has chosen to only provide those services at a few hub schools.

133.    This policy prevents consideration of attendance at a neighborhood school for E.J., H.S., and other children with intellectual disabilities and/or cognitive impairments regardless of individual aptitude or need.

134.    Thus students, like Plaintiffs, who are entitled to special education services, but who also wish to attend school with their siblings, friends, and neighbors, are unable to do both.

135.    The IDEA, Section 504 of the Rehab Act, and the ADA protect children with disabilities from being provided separate and unequal educational services.

136.    The ADA is based on Congress's findings that, *interalia*, (1) [h]istorically society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem. 42 U.S.C. §12101(a)(2).

137.    Additionally, the ADA acknowledges that (ii) individuals with disabilities continually encounter various forms of discrimination, including…relegation to lesser services, programs, activities, benefits, jobs or other opportunities. 42 U.S.C. §12101(a)(5).

138.    Congress specifically found that "discrimination against individuals with disabilities persists in such critical areas as…education." 42 U.S.C. §12101(a)(3).

139.    The IDEA reflects a presumption that a child with a disability will be educated in the school they would have attended if not disabled. 34 C.F.R. 300.116(c).

140.    The IDEA further contemplates that a child with a disability should only be removed from a general education classroom after meaningful consideration is given to all the supplementary aids and services that could be provided to a child in the general education classroom. 34 C.F.R. §300.114 (a)(2).

141.    Removal is only appropriate if the IEP cannot be implemented after all possible services have been explored. 34 C.F.R. §300.114 (a)(2), 300.116(e).

142.    The IDEA also presumes that a child's placement decision should be individualized, and cannot be made solely on factors such as category of disability, severity of disability, availability of special education and related services, configuration of the service delivery system, availability of space, or administrative convenience.  34 C.F.R. §300.116(a)(2) and (b)(2).

143.    Despite these protections, SLCSD operates a system that functionally denies E.J., H.S., and other children with disabilities the same rights as their nondisabled peers.

144.    As a result of SLCSD's system, once a child is designated as having a "mild/moderate" cognitive impairment, or a "severe" cognitive impairment, they are assigned to a hub school rather than their neighborhood school based entirely on this designation.

145.    SLCSD's system prevents Plaintiffs and other similarly situated children from being accommodated individually because any student designated as having an intellectual disability or cognitive impairment can only be served at a designated hub school.

146.    While SLCSD had historically disallowed these children from attending their neighborhood schools, the District codified this practice into a formal policy in March of 2019.

### D.    SLCSD'S Historical Discriminatory Treatment of Children with Intellectual Disabilities and/or Cognitive Impairments

147.    Students with intellectual disabilities and/or cognitive impairments have been prevented from attending their neighborhood school within SLCSD for decades.

148.    In or about 2001, SLCSD implemented a system known as the "quadrant system."

149.    This system established a scheme wherein classrooms of disability severity categories were set up at each corner or "quadrant" of the District.

150.    As a result, children designated as "mild/moderate" or "severe" were bussed to locations across the District, and were often forced to move schools multiple times throughout elementary school.

151.    In March of 2019, SLCSD announced plans to further consolidate the quadrant system into hub schools more centrally located within the District.

E.    **SLCSD Consolidates Service Delivery for Children with Intellectual Disabilities and/or Cognitive Impairments**

152.    In March of 2019, SLCSD announced that it would consolidate educational services for certain children with intellectual disabilities and/or cognitive impairments. The stated purpose of the consolidation was to congregate children with disabilities at specific elementary schools in an effort to maximize efficiency in service delivery and transportation.

153.    At the time the policy was presented to the SLCSD School Board, Ms. Halverson stated that SLCSD intended to create "hub" schools to house group programs for special education students whose needs the District had deemed too significant to be accommodated in a typical general education classroom with supplementary aids and services.[2]

154.    Ms. Halverson explained that the group program designations and locations would be entirely based on the severity of the intellectual disability and/or cognitive impairment of the students.

155.    Ms. Halverson identified that elementary school students categorized as "mild/moderate" would be located at Backman, Emerson, and Franklin Elementary, while students with "severe" disabilities would be assigned to Highland Park, Nibley Park, Meadowlark and Parkview Elementary.

156.    A separate program for children designated as "severe" and deemed "medically fragile" would remain at Dilworth.

157.    Ms. Halverson explained that SLCSD had approved this change because of its belief that the "quadrant system" had delivered special education services in a "disjointed" manner,

---

[2] *SLCSD Board Meeting Presentation* (Mar. 5, 2019), attached hereto as Exhibit 1.

requiring students to repeatedly transfer to new schools from year to year, and that consolidating services in this manner would supposedly address this problem.[3]

158.    At one point, Ms. Halverson made it clear that SLCSD would *not* consider the individual needs of students in assigning them to their new group programs: "So, regardless of a student's disability, they would go to one of these hubs."[4]

159.    While developing this proposal, SLCSD did not consult with the majority of parents of students with disabilities who would be directly impacted by the change.

160.    No efforts were made to return children to their neighborhood schools.

161.    Instead, children were simply reassigned to one of the consolidated hub schools.

162.    Once the proposal was approved by the SLCSD School Board, SLCSD sent out a mailer to parents of students with disabilities informing them of the upcoming change.

163.    Following the presentation, IEP meetings were not systematically scheduled for students affected by the change.

164.    Some parents requested IEP meetings to discuss the impact of the proposal on their students' special education services. In those meetings, parents were not given the option of having their students remain at their current schools or return to their neighborhood schools; rather, they were told that they must agree to the move if they wanted their students to continue receiving the same level of special education services.

---

[3] *SLCSD Board Meeting* (Mar. 5, 2019), https://www.slcschools.org/board-of-education/board-meetings/2018-19/20190305-1830-1/audio/ [hereinafter SLCSD Board Meeting 1].
[4] *Id.* Here, Ms. Halverson was referring to SLCSD's strategy regarding all students affected by the "hub school" plan.

**F.     SLCSD's "Hub Schools" Have Failed to Resolve Systemic Failures, and Instead Compounded Unequal Treatment of Students with Disabilities**

165.     When SLCSD first announced its "hub school" plan in March 2019, many of the given justifications for the change centered around the idea that reconfiguring the District's service delivery patterns would enable more students with disabilities to access at least some kinds of general education "experiences."

166.     In highlighting the decision to further consolidate services, Ms. Halverson acknowledged SLCSD's long-term systemic failure to provide students with an education in the least restrictive environment[5] and to effectively and equitably allocate resources throughout the District,[6] and claimed that the shift to a hub plan would result in more inclusion for students with disabilities despite the fact that the model effectively prohibits consideration of the school these students would attend if not disabled.

167.     To that end, with the new plan now in effect, SLCSD has claimed that it has successfully accomplished its goal of substantially increasing access to the general education environment across the board.

168.     On the contrary, new student demographic data at each of SLCSD's new hub schools suggests that clustering students with disabilities together in separate schools away from their family, friends, and the local community in fact harms overall inclusion.

---

[5] SLCSD Board Meeting 1, *supra* note 3 (*Halverson*: "…we have multiple grades in a classroom and a teacher attempting to teach core to three different grade levels of students and somewhat limited access to tier 1 instruction in their least restrictive environment.").

[6] SLCSD Board Meeting 1, *supra* note 3 (*Halverson*: "…we also have a disparity where some feeder patterns are really full and that's how the feeder pattern rolls and other feeder patterns that are a lot smaller. So it's not really an equitable use of our resources.").

169.    Data taken from the District's three "mild/moderate" elementary school hubs, Backman, Emerson, and Franklin, shows a marked increase in the percentage of the student body currently receiving services via an IEP at each of these three schools in the wake of the hub plan's implementation. The number of students with disabilities at Backman and Franklin increased by a factor of approximately 33% and 66% respectively. At Franklin, the percentage of students with IEPs more than doubled to comprise 31.93% of the overall student body.[7]

170.    The U.S. Department of Education has stressed the importance of providing for "the inclusion of children with disabilities in proportion to their presence in the general population," otherwise known as "natural proportions."[8]

171.    In addition, consolidating such a significant number of students with intellectual disabilities and/or cognitive impairments has had a pronounced effect on the length of time which students with disabilities must spend traveling to and from school on the bus.

172.    For the 2019-20 school year after the implementation of the hub plan, the average duration of an individual special education school bus route was 61.3 minutes.

173.    Notably, one afternoon bus route at Highland Park now lasts 121 minutes, with several individual bus routes in excess of 90 minutes at Parkview, Meadowlark, and Dilworth.

174.    Students who attend their neighborhood schools are frequently able to walk to school, or spend much less time being transported to and from school.

---

[7] *SLCSD Board Meeting Presentation* (Jan. 21, 2020), attached hereto as Exhibit 2.
[8] U.S. Department of Education, "Policy Statement on Inclusion of Children with Disabilities in Early Childhood Programs," p. 9 at note IX (Sept. 14, 2015).

**G.**   **"Hub" Services are not Required in Order to Adequately Serve Plaintiffs or Similarly Situated Children**

175.   SLCSD has chosen to design its service system for children with intellectual disabilities and/or cognitive impairments around hub schools rather than accommodate their needs in neighborhood schools.

176.   It is SLCSD's chosen methods of administration and the configuration of its service delivery system that require students to be congregated and separated from their neighborhood schools, rather than any unique or individualized need of a particular child.

177.   While SLCSD claims that the decisions to place children at hub schools are individualized, they are not. The only decision relevant to school placement is whether or not the child has a "mild/moderate" or "severe" intellectual disability or cognitive impairment.

178.   In E.J.'s due process hearing, Ms. Halverson conceded that the District did not have to structure their special classes as group programs.

179.   Specifically, Ms. Halverson conceded that the District is not required to have special classes labeled "Essential Elements" and "Academic Support," and that these are not categories contemplated by the IDEA. Rather, these programs were created by the District.

180.   When the IDEA states that an LEA must make available a continuum of alternative placements, this means that every student must have the opportunity to attend any placement along the continuum should they require it. This does not mean that all categories must exist within a district at any given time, nor that a district must design its system around these categories, but that an IEP team must have the option to consider any given point on the continuum if it is what any individual student needs.

181.    Students in the District who are classified as having a "mild/moderate" or "severe" intellectual disability or cognitive impairment are categorically excluded from consideration of the first stop along the continuum because of their disability category, limiting their access to the full continuum available to other students.

182.    This was confirmed by two District employees who testified in EJ's due process hearing and who are often a part of recommending services for students with intellectual disabilities and/or cognitive impairments. In their nineteen and eleven years, respectively, as District employees, neither could recall a single student with a cognitive impairment that they had recommended be placed in the general education environment at their neighborhood school.

183.    One witness, a school psychologist, further indicated that he would not consider placement in a general education setting for a student with an IQ at or below 70.

184.    Ms. Halverson, the special education director at the time, confirmed that the District uses IQ scores to determine if a placement in Essential Elements or Academic Support is more appropriate.

185.    Specially, she stated that a student with an IQ of less than 70 with a flat IQ profile would be placed in Essential Elements special class, while students with an IQ above 70 or without a flat IQ profile would be placed in Academic Support special class.

186.    The District has available services at its neighborhood schools, but refuses to modify its hub plan to allow for individualized services.

187.    Ms. Halverson intimated that many services exist in theory at neighborhood schools.

188.    These services include the provision of aides or paraeducators, modified curriculum, strategies to reduce distractions and provide organization, and help attending to tasks.

189.    In addition, related services including physical therapy, occupational therapy, and speech language pathology are routinely provided at all schools in the District.

190.    Ms. Halverson confirmed that these services can be provided by pushing in services to the general education classroom or by pulling students out to work on specific tasks in a resource room.

191.    However, these modalities are not available for or widely used for those students designated as "mild/moderate" or "severe."

192.    Instead, these services are reserved for students with disabilities that the District views as less significant, and who perform at or near academic grade level.

193.    This practice will continue to exclude students with intellectual disabilities and/or cognitive impairments from any hope of attending their neighborhood school.

194.    School districts can use other teaching models for the inclusion of students with disabilities. For example, a district could use an itinerant teaching model where itinerant special education professionals support general education teachers.

195.    In fact, in January of 2021, the Utah Special Education Advisory Panel provided a memorandum on systems change for meaningful inclusion of students with disabilities to Utah State Board of Education, which included a recommendation for an itinerant teaching model because a knowledge gap for general education teachers on inclusive practices is a barrier to more inclusion.

196.    The memorandum pointed out other barriers and made other recommendations, including: school districts should provide training, along with the Utah State Board of Education, to integrate general education and special education rather than having them compete; the Utah State Board of Education, school districts, and administrators should create system to identify effective accommodations and track their implementation, ensuring that these accommodations are met in all school environments.

197.    It is the District's preference to congregate students with intellectual disabilities and/or cognitive impairments at specific locations to maximize efficiencies. It is not required by the needs of individual students.

### H.    The SLCSD Hub Operates at the Cost of Equal Treatment for Plaintiffs and Similarly Situated Children with Disabilities

198.    When making placement decisions, a school district must first thoroughly consider the full continuum of placements, focusing on how services can be provided and goals addressed within the general education setting of the school a child would have attended were they not disabled (their neighborhood school). Then, only if the IEP team determines that FAPE cannot be delivered within the general education classroom, would consideration for removal to an alternative setting be appropriate. Placement decisions reflect minutes in and removed from general education. Any time a student spends outside of general education needs to be justified based on the ability or inability to deliver the IEP in the general education setting. Required curriculum modifications, administrative configurations, and staff training are not appropriate considerations for removal.

199.    Because the District has adopted a hub plan, it has removed meaningful consideration of the first stop along the continuum of placements – the general education environment in the school the student would attend were they not disabled.

200.    As a result, IEP teams routinely pass over this first stop on the continuum of placements. Records reflect that SLCSD did not follow the required procedure in deciding H.S.'s placement and have never followed this required procedure in deciding E.J.'s placement.

201.    Further, both IEP teams failed to meaningfully consider E.J.'s or H.S.'s ability to attend the school they would attend were they not disabled (their neighborhood school) with the aid of individualized supports because the hub plan leaves no room for IEP teams to consider the full continuum of services.

202.    As a result of the District's hub plan, IEP teams cannot consider the full continuum of placements and instead jump to a "special class" group placement for students with intellectual disabilities and/or cognitive impairments.

203.    For these students, the group placement at a "hub school" is predetermined.

204.    On information and belief, SLCSD routinely fails to follow this required procedure or meaningfully consider the full continuum of services for many students in the District who are categorized as "mild/moderate" or "severe."

205.    Parents have reported to the DLC that the District routinely refuses to implement out of state IEPs that don't fit their program; this is particularly true when a child with an intellectual disability was previously being supported in a general education classroom.

206.    The SLCSD hub system allows a building to determine the services available, rather than the IEP team, on the basis that all students must attend the group program associated with

their severity category. This creates a systemic rejection of a thorough consideration of students' unique needs in favor of categories, assumptions, and stereotypes, and prioritizes administrative convenience over individualized education.

207.    For example, while resource classrooms exist throughout the District where trained special educators make use of "pull-out" and "push-in" models to provide support to individual students in the general education environment, SLCSD categorically does not offer such settings to students designated as having "mild/moderate" or "severe" disabilities.

208.    In setting District policy, SLCSD has favored rigid categorization and segregated group programs to the total exclusion of any effort to facilitate access to individualized supports in the general education environment with collaborative support from special education personnel.

209.    Accordingly, in configuring service delivery, SLCSD has consistently focused on group programs and not on designing the individualized supports that can be delivered in the classroom by general education with consultative or collaborative support from special education personnel, as reflected in the record.

210.    The apparent motivations for this configuration – such as staff availability, lack of space, and administrative convenience– are proscribed outright as inappropriate reasons to remove a student from the general education setting. The District has also acknowledged that other inappropriate factors, such as financial considerations, have played a determinative role in placement decisions within the hub system scheme.

211.    While the hub system operates to the benefit and ease of the District, it operates to the detriment of children with disabilities because it is premised on removing them from their natural communities.

212.    This is the very type of disparate treatment that the IDEA, ADA, and Rehab Act have all sought to remedy.

VII.    **CAUSES OF ACTION**

**CLAIM ONE**

**(Violation of Title II of the Americans with Disabilities Act)**

213.    Plaintiffs re-allege the allegations in all preceding paragraphs as though fully set forth herein.

214.    Each of the Plaintiffs is an "individual with a disability" within the meaning of the ADA in that they have disabilities that substantially limit one or more major life activities, such as self-care, learning, working, and brain function.  42 U.S.C. §§12102(1)(A), 12102(2).

215.    As school-age children, they are qualified to participate in Defendants' educational programs and services. 42 U.S.C. § 12131(2).

216.    Defendant Salt Lake City School District is a public entity covered by Title II of the ADA. Defendant Board of Education of Salt Lake City Schools are officials responsible for running this public entity and supervising their operations. 42 U.S.C. § 12131(1). The District's Director of Special Education is responsible for providing appropriate services to children with disabilities within SLCSD. Therefore, the ADA prohibits the Defendants from discriminating against individuals with disabilities in its programs and services.  *See* 42 U.S.C. §§ 12131 and 12132.

217.    Through the acts and omissions described above, Defendants are violating Title II of the ADA by:

a. Denying Plaintiffs and other students an opportunity to participate in and benefit from educational services that is equal to that afforded other students;

b. Denying Plaintiffs and other students educational services that are as effective in affording equal opportunity to obtain the same result, gain the same benefit, or reach the same level of achievement as that provided other students;

c. Denying Plaintiffs and other students the opportunity to receive educational programs and services in the most integrated setting appropriate to their needs;

d. Failing to reasonably modify SLCSD's programs and services as needed to avoid discrimination against Plaintiffs and other students; and

e. Utilizing methods of administration that have the effect of defeating or substantially impairing the accomplishment of the objectives of Defendants' educational programs with respect Plaintiffs and other students.

218. Granting relief to Plaintiffs would not fundamentally alter Defendants' programs, services, and activities.

219. The acts and omissions of Defendants have caused and will continue to cause Plaintiffs and other students, who include DLC constituents, to suffer irreparable harm, and they have no adequate remedy at law.

## CLAIM TWO

### (Violation of Section 504 of the Rehabilitation Act)

220. Plaintiffs re-allege the allegations in all preceding paragraphs as though fully set forth herein.

221.    Under Section 504 of the Rehabilitation Act, "No otherwise qualified individual with a disability … shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. §794(a).

222.    Defendants administer the programs in question under the IDEA, a federally funded program, and, thus, receive federal financial assistance within the meaning of Section 504.

223.    Each of the Plaintiffs is an "individual with a disability" within the meaning of Section 504 because they have disabilities that substantially limit one of more major life activities, such as self-care and social interaction.

224.    Each Plaintiffs are "qualified person with disabilities" within the meaning of Section 504 because he or she is qualified to participate in Defendants' educational programs and services.

225.    Section 504 implementing regulations require a public entity administer its services, programs, and activities in "the most integrated setting appropriate" to the needs of qualified individuals with disabilities.  28 C.F.R. § 41.51(d).

226.    Section 504 regulations further prohibit recipients of federal financial assistance from:

> [U]tiliz[ing] criteria or methods of administration … (i) that have the effect of subjecting qualified handicapped persons to discrimination on the basis of handicap, [or] (ii) that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the recipient's program with respect to handicapped persons.

45 C.F.R. §84.4(b)(4)(i)-(ii); 28 C.F.R. §41.51(b)(3)(i)-(ii).

227.    Through the administration of their programs, Defendants have caused the segregation of the Plaintiffs and other students from the rest of their community by denying them access to their neighborhood school.

228.    Through the administration of their programs, Defendants have failed to operate their service systems in such a way as to make services available in the most integrated setting appropriate to the needs of the Plaintiffs and other students.

229.    Through the administration of their programs, Defendants have caused the Plaintiffs and other students to be treated on grounds not equal to those of their peers in the community.

230.    Such administration has the effect of defeating or substantially impairing the objectives of the service programs with respect to the Plaintiffs and other students.

231.    Providing the Plaintiffs and other students access to their neighborhood schools with appropriate educational services would not fundamentally alter Defendants' educational programs or services.

232.    Defendants' actions violate Section 504 of the Rehabilitation Act.

## CLAIM THREE

### (Violation of the Individuals with Disabilities Education Act)

233.    Plaintiffs re-allege the allegations in all preceding paragraphs as though fully set forth herein.

234.    Through the acts and omissions described above, Defendants are violating the IDEA by:

a.  Failing to provide FAPE to Plaintiffs in the least restrictive environment, as mandated by the IDEA, denying them the opportunity to receive education in the regular classroom environment to the maximum extent appropriate and by segregating them unnecessarily from their non-disabled peers and the community (34 C.F.R. §300.115, 34 C.F.R. §300.116 (a)(2) and (b)(2)); and

b.  Failing to make Plaintiffs' placement decisions based on their individual needs and instead basing the decision on the availability of group programs and other impermissible factors such as the category of disability, severity of disability, availability of special education and related services, configuration of the service delivery system, availability of space, and/or administrative convenience by (34 C.F.R. §300.116(a)(2) and (b)(2)):

   i.  Failing to give consideration to the full range of supplementary aids and services that could be provided to Plaintiffs in the regular education environment before removing them to one of the District's designated "hub schools" for students with intellectual disabilities and/or cognitive impairments.

   ii.  Failing to meaningfully consider the full continuum of placement options available for Plaintiffs in order to allow them to attend the school they would have attended were if not disabled, including the school closest to their homes, based on the District's perceived severity of their disabilities;

iii.    Removing Plaintiffs from education in age-appropriate regular classrooms solely because of needed modifications in the general curriculum; and

iv.    Failing to give consideration to the potential harmful effects on Plaintiffs of being removed from and denied access to the regular classroom environment at the school they would attend if not disabled.

## VIII.  <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs respectfully request that the Court:

A.    Order and declare that Defendants are violating the rights of Plaintiffs and other similarly situated children under Title II of the ADA, 42 U.S.C. § 12101, et seq., and its implementing regulations;

B.    Order and declare that Defendants are violating the rights of Plaintiffs and other similarly situated children under the Rehab Act and its implementing regulations as described herein;

C.    Order and declare that Defendants are violating the rights of Plaintiffs and other similarly situated children under the IDEA, and its implementing regulations as described herein;

D.    Permanently enjoin Defendants, their successors in office, agents, employees and assigns, and all persons acting in concert with them from denying Plaintiffs and similarly situated students with the school-based services they need to enjoy equal educational opportunity to their nondisabled peers and to receive appropriate educational programs and services in the most integrated setting and least restrictive environment as required by the IDEA, Rehab Act, and Title II of the ADA;

E.     Order SLCSD to make individualized placement decisions for each of the Plaintiffs based on their IEPs and meaningfully consider the full continuum of placement options and supplementary aids and services necessary to place them at their neighborhood schools;

F.     Award the DLC appropriate compensation for diverted resources expended in investigating the District's hub system, including financial and personnel resources expended in investigation, engagement with administrative processes, and retaining experts;

G.     Award Plaintiffs their reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 12205, 29 U.S.C. § 794a, and any other applicable provision of prevailing law; and

H.     Grant any other relief which is necessary and appropriate to protect the federal rights of Plaintiffs and similarly situated individuals.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury in accordance with Rule 38 of the Federal Rules of Civil Procedure.

RESPECTFULLY SUBMITTED this 16th day of May 2022.

DISABILITY LAW CENTER
Attorneys for Plaintiffs

By /s/ Laura Henrie
LAURA HENRIE (Bar No. 12449)
NATE CRIPPES (Bar No. 14622)
MICHELLE C. MARQUIS (Bar No. 16889)
KATIE COX (Bar No. 17188)
MAYA ANDERSON (Bar No. 17559)
**DISABILITY LAW CENTER**
205 North 400 West
Salt Lake City, Utah 84103

Phone: (801) 363-1347
Fax: (801) 363-1437
Email: lhenrie@disabilitylawcenter.org