Laura Henrie (Bar No. 12449)
Nate Crippes (Bar No. 14622)
Michelle C. Marquis (Bar No. 16889)
Katie Cox (Bar No. 17188)
Maya Anderson (Bar No. 17559)
**DISABILITY LAW CENTER**
960 South Main Street
Salt Lake City, Utah 84101
Telephone: 800.662.9080
Email: lhenrie@disabilitylawcenter.org
         ncrippes@disabilitylawcenter.org
         mmarquis@disabilitylawcenter.org
         kcox@disabilitylawcenter.org
         mvanderson@disabilitylawcenter.org

*Attorneys for Plaintiffs*

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| KRISTIN JACOBS, legal guardian of E.J.; AMANDA SANDY, legal guardian of H.S.; AND DISABILITY LAW CENTER, a Utah nonprofit corporation,<br><br>Plaintiffs,<br><br>vs.<br><br>SALT LAKE CITY SCHOOL DISTRICT; and BOARD OF EDUCATION OF SALT LAKE CITY SCHOOLS,<br><br>Defendants. | **PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' RULE 12(b)(1) AND 12(b)(6) MOTION TO DISMISS THE AMENDED COMPLAINT (DOC. 27) AND MEMORANDUM IN SUPPORT**<br><br>Case No. 2:21-cv-00706-JNP-CMR<br><br>Judge Jill N. Parrish<br><br>Magistrate Judge Cecelia M. Romero |

## TABLE OF CONTENTS

I.     THRESHOLD ISSUES……………………………………………………………...1

A. APPLICABLE LEGAL STANDARDS………………………………………..……1

B. THE 12(B)(1) MOTION TO DISMISS SHOULD BE CONSTRUED AS A PARTIAL MOTION TO DISMISS BECAUSE IT DOES NOT ADDRESS ALL STANDING AVAILABLE TO PLAINTIFF DLC …………………………………………………..2

II.    INTRODUCTION

Defendants' Redressability Argument Misunderstands 10th Circuit Precedent ………….5

Neither *Urban* nor *Murray* Prevent Plaintiffs from Stating a Redressable Claim………..6

      1.  *Urban*……………………………………………………………………..6

      2.  *Murray*……………………………………………………………………10

III    STANDING……………………………………………………………………...10

A.  STUDENT PLAINTIFFS………………………………………………………10

Article III Standing …………………………………………………………………...10

Defendants' Argument …………………………………………………………………..11

Plaintiffs E.J. and H.S. Have Suffered an Injury-in-Fact Because They Have Alleged a Concrete and Particularized Injury That Is Actual and Imminent ………………………11

Plaintiff E.J. and H.S.'s Injuries are Traceable to the Action of the Defendants………..20

Plaintiff E.J. and H.S.'s Claims are Redressable Because the Relief Sought is Available under the IDEA, 504, and ADA and it is Likely that Their Injury Will Be Addressed by a Favorable Decision……………………………………………………………………20

Conclusion……………………………………………………………………………24

B.   PLAINTIFF DLC…………………………………………………………………24

Plaintiff DLC Can Show Individual Standing Per Statutory Authority Under the

Protection and Advocacy for Individuals with Developmental Disabilities Act Created by

the Developmental Disabilities Assistance and Bill of Rights (DD) Act……………..24

Plaintiff DLC Can Show Associational Standing Via the *Hunt* Factors………………...25

Plaintiff DLC Can Show Organizational Standing.........................................................29

IV.   EXHAUSTION OF PLAINTIFFS' SECTION 504 CLAIMS WOULD HAVE BEEN

FUTILE……………………………………………………………………………………..32

Plaintiffs' Section 504 Claim Alleges Systemic Violations and Is Therefore Exempt from

Exhaustion…………………………………………………………………………..32

Defendants Failed to Provide Timely Notice of Procedural Safeguards Regarding Section

504 Due Process Requests……………………………………………………………39

V.      CONCLUSION…………………………………………………………………4

Plaintiffs E.J. and H.S., by and through their parents and legal guardians Kristin Jacobs and Amanda Sandy, respectively, and Plaintiff Disability Law Center (the "DLC"), by and through undersigned counsel and pursuant to DUCivR 7-1, hereby oppose Defendants Salt Lake City School District and Board of Education of Salt Lake City Schools' (collectively "Defendants") *Rule 12(b)(1) and 12(b)(6) Motion to Dismiss the Amended Complaint (DOC. 27) and Memorandum in Support* (ECF No. 32) and respectfully submit the following memorandum of points and authorities in opposition thereto.

## I.   THRESHOLD ISSUES

### A.  APPLICABLE LEGAL STANDARDS

The Defendants allege that the Plaintiffs' *First Amended Complaint* (ECF No. 27) fails under both Rule 12(b)(1) and 12(b)(6). (Defs.' Mot. Dismiss at 1-3, ECF No. 32.) Generally, motions challenging subject matter jurisdiction can take two different approaches: a facial attack or a factual attack.  "A facial attack assumes the allegations in the complaint are true and argues [Plaintiffs] fail to establish jurisdiction." "A factual attack goes beyond the allegations in the complaint and adduces evidence to contest jurisdiction." *Baker v. USD 229 Blue Valley* 979 F. 3d 866, 872 (10th Cir. 2020).  The Defendants' *Motion* should be considered a facial attack insofar as they have not supplied nor referenced any outside information upon which the court should rely. Similarly, the court's function on a Rule 12(b)(6) motion to dismiss is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted. *Dubbs v. Head Start, Inc*., 336 F.3d 1194, 1201 (10th Cir. 2003). When considering the Defendants' Rule

12(b)(6) *Motion*, the Court accepts all of the factual allegations contained in the Complaint as true with all reasonable inferences drawn in the Plaintiff's favor. *Id*. at 1201.

While Defendants assert that part of their *Motion to Dismiss* is truly a 12 (b)(6), the core of their 12 (b)(6) argument is actually a repackaged version of their redressability arguments under 12(b)(1). As a result, the entire motion should solely be considered as a challenge to Plaintiffs' standing. For the convenience of the court facts relevant to the *Defendants' Motion* will be repeated below.

## B. THE 12(B)(1) MOTION TO DISMISS SHOULD BE CONSTRUED AS A PARTIAL MOTION TO DISMISS BECAUSE IT DOES NOT ADDRESS ALL STANDING AVAILABLE TO PLAINTIFF DLC

The Defendants' 12(b)(1) *Motion to Dismiss* should be construed as a *Partial Motion to Dismiss*. In practice, a motion to dismiss is a *partial* motion to dismiss when it doesn't resolve the case in its entirety. *See, e.g., Rudder Holding Company, LLC v. Christensen*, 2021 WL 1171781 (D. Utah, March 28, 2021) (unpublished) (partial motion to dismiss); *Theo M. v. Beacon Health Options*, 2020 WL 5500529 (D. Utah, Sept. 11, 2020) (unpublished) (partial motion to dismiss).

Defendants argue that Plaintiff DLC does not have individual or associational standing, but they do not make a cognizable argument against organizational standing. (Defs.' Mot. Dismiss at 1-2, 12-25.) Although the 12(b)(1) *Motion* includes a section heading referencing both associational and organizational standing, Defendants conflate associational and organizational standing into a single analysis which only addresses elements of associational standing. (*Id*. at 22.) Therefore, although Defendants purport to seek complete dismissal of

Plaintiffs' *First Amended Complaint*, their *12(b)(1) Motion* should be construed as a *Partial Motion*.

## II.   INTRODUCTION

Whether analyzed under 12(b)(6) or 12(b)(1), Defendants' *Motion to Dismiss* is entirely premised upon a fundamental mischaracterization of the discrimination that Plaintiffs' *Amended Complaint* alleges exists within the Salt Lake City School District ("The District"), as well as a misstatement of structural relief sought by Plaintiffs. In particular, the District repeatedly states that Plaintiffs seek the "absolute right" to attend their neighborhood schools, despite the fact that the phrase "absolute right" is contained nowhere in the Plaintiffs' *Amended Complaint*. (Defs.' Mot. Dismiss at 1-2, 12.)  Defendants also incorrectly assert that Plaintiffs seek to create every educational program offered by the District at every single school, thereby plunging the District into imagined insolvency. (*Id.* at 36-37.)  Again, Defendants point to no language in Plaintiffs' *Amended Complaint* to support this assertion, and actively ignore the facts Plaintiffs' *Amended Complaint* asserts that each school already provides special education services for other students without intellectual disabilities and/or cognitive impairments at each school within the district. (Am. Compl. ¶¶ 57, 119, 124, 128-131, 186-190.) Thus, Defendants' description is ultimately as hyperbolic as it is inaccurate.

However, Defendants' description of the harm asserted in Plaintiffs' *Amended Complaint* does not stop at simply being inaccurate. It also omits key components of the alleged discrimination in order to artificially narrow the relief that is sought. In particular, the *Amended Complaint* clearly alleges that the District's policy is discriminatory because it "hubs first," and "asks questions later." As a result, Plaintiffs are not only categorically denied any possibility of

attending their neighborhood school, but they are additionally denied consideration for placement in a general education classroom, anywhere, at any school. (Am Compl. ¶¶ 52, 57, 59, 106-107, 116-117, 119, 122-123, 145-146 153-164, 181-185.) This policy prevents Plaintiffs, and all children with intellectual disabilities and/or cognitive impairments within the District, from enjoying the rights that are guaranteed under multiple federal laws.

Specifically, Plaintiffs allege that the District's hub policy makes compliance with the IDEA impossible by preventing placement decisions from being individualized. (Am. Compl. ¶¶ 19, 83-85, 117, 131-133, 198-204.)  Plaintiffs assert throughout their *Amended Complaint* that the District's policy prevents any consideration—let alone placement—of children with intellectual disabilities and/or cognitive impairments in *both* mainstream classes *and* at the schools they would attend if not disabled. (Am. Compl. ¶¶ 52, 57, 59, 106-107, 116-117, 119, 122-123, 145-146, 153-164, 181-185.) In essence, the *Amended Complaint* asserts that the first stop along the IDEA's educational continuum is entirely bypassed for children with intellectual and developmental disabilities in order to comply with the District's hub plan. The IDEA's regulations make clear that this practice is explicitly prohibited. (Am. Compl. ¶¶ 81-85.)

In addition, Defendants' *Motion* fails to grapple with Plaintiffs' assertions that the ADA and Rehabilitation Acts are importantly implicated because the reason Plaintiffs and other similarly situated students are being subjected to this treatment is solely because of their particular disability categorization—that of intellectual disability and/or cognitive impairment. (Am. Compl. ¶¶ 17-18, 52, 59, 89-91, 97, 117,143-146, 147-163, 181, 206.) The fact that Plaintiffs allege it is their cognitive impairment and/or intellectual disability that precludes them

from an equal educational opportunity is precisely the type of discrimination the Rehab Act and ADA sought to prevent. (Am. Compl. ¶¶ 131-138.)

The plain language of Plaintiffs' *Amended Complaint* states that, in addition to declaratory relief, they seek to: 1) enjoin Defendants from denying student Plaintiffs and similarly situated students the services necessary to enjoy an equal educational opportunity under the ADA and Rehab Act; 2) to receive those services in the most integrated setting under the ADA and Rehab Act; 3) to receive services in the least restrictive environment under the IDEA; 4) to make individualized placement decisions under the IDEA; and 5) to meaningfully consider the full continuum of placement options and supplementary aids and services necessary to place student Plaintiffs in their neighborhood schools. (Am. Compl. ¶¶ 43-45.)

### Defendants' Redressability Argument Misunderstands 10th Circuit Precedent

As discussed *supra,* the Defendants' argument that 10th Circuit precedent prevents Plaintiffs from asserting a claim is more about redressability than it is about failing to state a claim.  (Defs.' Mot. Dismiss at 1-3.)  Defendants argue throughout their brief that that Plaintiffs' claims fail because they are not redressable in light of two 10th Circuit cases, *Urban by Urban v. Jefferson County School Dist. R-1* 89 F.3d 720 (10th Cir. 1996)*, and Murray By and Through Murray v. Montrose County School Dist. RE-1J.* 51 F.3d 921 (10th Cir., 1995). (Defs.' Mot. Dismiss at 3-6, 11, 17.)  The argument fails because Plaintiffs simply do not seek an "absolute right" to attend their neighborhood schools, but rather an individualized placement decision that 1) considers the full array of supplementary aids and services before removal from a general education classroom and 2) an individualized placement decision that is not categorically based on impermissible factors, and an equal educational opportunity that includes meaningful

consideration of attendance at the school they would attend if not disabled, as well as the opportunity to be educated in the most integrated setting appropriate to the individual child's needs. (Am. Compl. ¶¶ 43-45.) Moreover, Defendants' reliance on these cases as a means to dismiss Plaintiffs' *Amended Complaint* is misplaced.

In *Lujan v. Defenders of Wildlife*, the Supreme Court described the redressability bar as a lax one where an individual challenges a governmental action that directly impacts the Plaintiff. The Court noted,

> When the suit is one challenging the legality of government action or inaction, the nature and extent of facts that must be averred (at the summary judgment stage) or proved (at the trial stage) in order to establish standing depends considerably upon whether the plaintiff is himself an object of the action (or forgone action) at issue. If he is, there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it. 504 U.S. 555, 561-62 (1992).

Clearly, the *Amended Complaint* contends that E.J. and H.S. are challenging an action that has directly affected them. (Am. Compl. ¶¶ 52, 57, 59, 90, 94, 96, 103, 107, 116-117, 119, 122-123, 145-146, 181-185, 200-204.)  As a result, Defendants' additional arguments about redressability create an inappropriately heightened bar.

## Neither *Urban* nor *Murray* Prevent Plaintiffs from Stating a Redressable Claim

### 1.  *Urban*

In *Urban by Urban v. Jefferson County School Dist. R-1*, the Tenth Circuit held that the IDEA does not confer an individual right to attend a neighborhood school as a matter of law. 89 F.3d at 728.  This holding is unsurprising, and not at odds with the Plaintiffs' claims nor their

requested relief.[1] The record in *Urban* reflects that the student in question was being provided appropriate services in an alternative program at a non-neighborhood school, however, even that determination was predicated on consideration of the services available at the student's neighborhood school. Specifically, the administrative law judge noted that "that the District should consider whether services available in Evergreen could be used for Gregory's IEP." *Id.* at 723. This is precisely the problem outlined in Plaintiffs' *Amended Complaint*. The District fails to even consider what services are already available at neighborhood schools for EJ, HS, and other students with intellectual and developmental disabilities.  (Am. Compl. ¶¶ 182-193.)

Finally, the Tenth Circuit explicitly noted that their decision in *Urban* did *not* contradict their holding in *New Mexico Association for Retarded Citizens* where the court found that the state of New Mexico had failed to provide adequate educational services for children with disabilities, and specifically had "failed to accommodate and integrate those handicapped children into physical education, vocational counseling, learning and personal guidance

---

[1] Defendants' redressability arguments can be properly framed as Rule 56 arguments that the Plaintiffs' claims fail as a matter of law.  "However, a court is required to convert a Rule 12(b)(1) motion to dismiss into a Rule 12(b)(6) motion or a Rule 56 summary judgment motion when resolution of the jurisdictional question is intertwined with the merits of the case. The jurisdictional question is intertwined with the merits of the case if subject matter jurisdiction is dependent on the same statute which provides the substantive claim in the case. *Holt v. United States,* 46 F.3d 1000, 1003 (10th Cir.1995).

This is also evidenced by the fact that all the cases cited by Defendants for the proposition that Plaintiffs seek a remedy that is inherently unavailable were cases that advanced to the summary judgment phase. For example, in *Urban*, neither the hearing officer, administrative law judge, district court judge, nor the Tenth Circuit determined that the student's claims should be preliminarily dismissed simply because he was seeking to attend his neighborhood school, rather the argument that he should be placed at his neighborhood school as a matter of law was rejected after a full examination of the record at the proper procedural time—unlike the present motion.

<u>PLS.' MEM. OPP'N DEFS.' MOT. DISMISS</u>, Page 7

programs presently serving their nonhandicapped classmates." 678 F.2d 847, 855 (10th Cir. 1982). To the contrary, the Court in *Urban* reaffirmed that "Section 504 requires accommodation in a neighborhood school when disabled children cannot receive educational benefits without accommodation." 89 F.3d at 728. Indeed, the language is clear that *Urban* does not stand for the proposition that no child can ever assert that they should be served in their neighborhood school regardless of claim or circumstance as Defendants allege. In other words, *Urban* does not create an absolute bar to challenging a non-neighborhood school placement. Rather, while acknowledging that Section 504 would likely not require a school district to modify its program in order to serve a single child in one school, there may certainly be cases where a school district's discriminatory practice would, in fact, be required to modify its policy to accommodate children at neighborhood schools. *Id.*

Defendants fail to contend with the discriminatory scheme actually asserted by Plaintiffs, and therefore allege that their claims fail because there is no "absolute right" to attend a neighborhood school. (Defs.' Mot. Dismiss at 1-2, 12.) However, this characterization misses the point. For instance, there may not be an absolute right for any person to eat pizza, but it would certainly be an unlawful practice for a city to prohibit access to pizza parlors for children based on the color of their skin, or the severity of a child's disability. Likewise, it would be unlawful for a school district to say all blind or visually impaired children could only use playgrounds at one school within a district regardless of the needs and individual circumstances of the members of the group. The *Amended Complaint* makes clear that the District does not, in fact, consider the individual needs of E.J., H.S. or any other child before subjecting them to the hub policy, but rather discriminates on the basis of the perceived severity of their disability category. (Am.

Compl. ¶¶ 17-18, 52, 59, 89-91, 97, 117, 143-146, 147-163, 181, 206.) The question is not whether the right to a particular facility or service is absolute, but whether the practice preventing access is discriminatory.

2.   *Murray*

Much like *Urban, Murray by and Through Murray v. Montrose County School Dist. RE-1J* is a case based on a factual record developed in one student's case. In *Murray*, the student was not asserting that they were being subjected to a systemically discriminatory policy, but rather an argument about whether the student in question was making sufficient progress in his general education placement at his neighborhood school. 51 F.3d 921, 924-25 (10th Cir. 1995).  *Murray* did not hold that no child may ever challenge their placement at a non-neighborhood school. Rather, *Murray* holds that there is not a presumption that a neighborhood school is necessarily the least restrictive environment for purposes of the IDEA. *Id*. at 930. Like *Urban, Murray* also reaffirms that there are instances where the neighborhood school would be the appropriate choice. Specifically, the court noted "that a disabled child should be educated in the school he or she would attend if not disabled (i.e., the neighborhood school), *unless* the child's IEP requires placement elsewhere. *Id*. at 929. Again, in the present instance, Plaintiffs have asserted that their IEPs do not determine the placement at the hub schools, but rather the District's impermissible and discriminatory motives such as administrative convenience and perceived severity of their disabilities.  (Am. Compl. ¶¶ 56-57, 141-158, 197.) This was particularly evident in the District's decision to subject all children with intellectual disabilities and/or cognitive impairments to their hub policy without first holding individual IEP meetings. (Am. Compl. ¶¶ 159-164.)

While these cases may stand for the proposition that any particular child does not have an absolute right to attend their neighborhood school, they similarly do not stand for the proposition there is an absolute bar to receiving special education services at a neighborhood school. In addition, neither of these cases contemplate a policy that disallows children with certain types of disabilities from attending neighborhood schools. This is precisely the type of policy that is apt for a challenge under antidiscrimination laws like the ADA and Rehabilitation Act.

## III.   STANDING

### A.  STUDENT PLAINTIFFS

The Court should deny Defendants' Rule 12(b)(1) *Motion* because Plaintiffs satisfy the requirements of Article III standing.

### Article III Standing

In order to have Article III standing, a plaintiff must allege that they have (1) "suffered an injury in fact," (2) that is "fairly traceable to the challenged action of the defendant," and (3) that is likely to be "redressed by a favorable decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citing *Lujan,* 504 U.S. at 560-61) (internal citations and quotation marks omitted). The party invoking federal jurisdiction bears the burden of establishing these elements. *See FW/PBS, Inc. v. Dallas,* 493 U.S. 215, 231(1990); *Warth v. Seldin,* 422 U.S. 490, 508 (1975).  Additionally, Plaintiffs "must have standing to seek each form of relief in each claim." *Bronson v. Swenson*, 500 F. 3d 1099, 1106 (10th Cir. 2007).

Each element of standing must be supported with the manner and degree of evidence required as any other matter on which the plaintiff bears the burden of proof. *See Lujan v. National Wildlife Federation,* 497 U.S. 871, 883–889 (1990); *Gladstone, Realtors v. Village of*

*Bellwood,* 441 U.S. 91, 114–15, and n. 31 (1979). Thus, in addressing standing at the motion to dismiss stage of proceedings, the court "must accept as true all material allegations of the complaint and must construe the complaint in favor of the [Plaintiffs, as] complaining part[ies]." *Coll v. First Am. Title Ins. Co.*, 642 F. 3d 876, 892 (10th Cir. 2011) (citing *Initiative and Referendum Inst. v. Walker,* 450 F.3d 1082, 1089 (10th Cir. 2006) (en banc)) (internal quotation marks omitted).

### Defendants' Argument

In their *Motion to Dismiss*, Defendants argue that Plaintiffs E.J. and H.S. do not have standing because neither of them has adequately alleged facts that satisfy either the injury-in-fact prong or the redressability prong. (Defs.' Mot. Dismiss at 13.) Defendants do not challenge the standing requirement of traceability in their motion, and therefore Plaintiffs presume that the Defendants concede this element. To the extent that the Court requires a discussion of the allegations supporting this element in order to rule on Defendants' 12(b)(1) *Motion*, Plaintiffs have included a brief section addressing this prong below.

### Plaintiffs E.J. and H.S. Have Suffered an Injury-in-Fact Because They Have Alleged a Concrete and Particularized Injury That Is Actual and Imminent

An injury in fact is the invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *D.L. v. Unified Sch. Dist. No. 497*, 596 F.3d 768, 774 (10th Cir 2010). "For an injury to be particularized, it must affect the plaintiff in a personal and individual way." *Lujan*, 504 U.S. at 560 n.1. "To be concrete, an injury must be real rather than abstract." *Lupia v. Medicredit, Inc.*, 8 F.4th 1184, 1190 (10th Cir. 2021).

At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss, a court "presum[es] that general allegations embrace those specific facts that are necessary to support the claim." *Lujan*, 504 U.S. at 561 (citing *Lujan,* 497 U.S. at 889).

In their *Motion to Dismiss*, Defendants baselessly claim that neither E.J. nor H.S. have alleged either a particular or concrete injury-in-fact arising from the District's use of the "hub school" model, despite being confronted with an abundance of allegations in the *Amended Complaint* establishing the real, personalized, and individualized impact of the District's discriminatory practices on E.J. and H.S., as well as allegations that support a finding that continued injury is imminent.

To support their claim, Defendants rely on a recent Tenth Circuit ADA decision, *Laufler v. Looper*, in a misguided attempt to analogize between E.J. and H.S. and the Plaintiff in that case. 22 F.4th 871, 874 (10th Cir. 2022).  In *Laufler*, the Plaintiff was a disabled website tester who filed a lawsuit against the owners of a Colorado hotel, alleging that the website violated the ADA by failing to provide sufficient information about disability accommodations. *Id.* The Plaintiff claimed that the Defendant's regulatory violation "infringed her 'right to travel free of discrimination and deprived her of the information required to make meaningful choices for travel.'" *Id.* at 875. In that case, the Tenth Circuit upheld the district court's dismissal for lack of standing after it was established that the Plaintiff did not have any actual plans to visit Colorado or book a room at the hotel, and therefore her alleged injury was not particularized to her, nor was it concrete. *Id.* at 877-78. The Court determined that the Plaintiff suffered no injury as a

result of the statutory violation because the only interest she had was in the abstract enforcement of the law, and "an injury in law is not an injury in fact." *Id.* at 877.

The Tenth Circuit's reasoning in this case is illuminating, and if anything, demonstrates that Plaintiffs E.J. and H.S. have adequately alleged an injury-in-fact in the *Amended Complaint*. In *Laufler*, the Court drew an important distinction between Ms. Laufler and the Plaintiff in another standing case, *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), where the Supreme Court found that a tester had standing to sue under the Fair Housing Act. *Laufler,* 22 F.4th at 878. In *Havens*, the Supreme Court determined that the Plaintiff had standing to sue under the Fair Housing Act because she alleged injury to the statutorily created right to truthful housing information, and the Defendants had provided her with untruthful information about the availability of housing for discriminatory reasons. *Id.* at 878-79 (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373 (1982) (internal citations omitted)).

The case at hand is similar to *Havens*, and distinguishable from *Laufler*, in that E.J. and H.S. have standing to sue because they have alleged injury to their statutorily created rights under the IDEA, Section 504, and the ADA, and the suffered injury is "precisely in the form that the statute was intended to guard against." *See id*. at 879 (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373 (1982) (internal citations omitted). Moreover, it is well established that "[t]he actual or threatened injury required by Article III may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing." *Warth*, 422 U.S. at 500.

The Defendants' argument that neither E.J. nor H.S. have alleged any injury-in-fact stemming from the District's discriminatory "hub school" system seems indicative of a fundamental misunderstanding of what is considered an injury for purposes of Article III

standing, particularly at this early stage in the litigation, where general factual allegations of

injury are sufficient for a plaintiff to meet the requisite burden because the court "presum[es] that

general allegations embrace those specific facts that are necessary to support the claim." *Lujan*,

504 U.S. at 561 (citing *Lujan*, 497 U.S. at 889).

In the *Amended Complaint*, H.S. and E.J. allege substantive deprivations of FAPE,

including that SLCSD failed to provide them with FAPE in the least restrictive environment, as

mandated by the IDEA, denying them both the opportunity to receive education to the maximum

extent appropriate and segregating them unnecessarily from their nondisabled peers. (Am.

Compl. ¶ 234.) Plaintiffs H.S. and E.J. also assert that Defendants have failed to make placement

decisions for them based on individual needs, instead basing these decisions on impermissible

factors including their disability category. (*Id.*)

Courts have acknowledged that the deprivation of FAPE is an actual injury suffered by a

student and his or her parents. *See Honig v. Doe*, 484 U.S. 305, 310-311 (1988); *see also*

*Winkelman ex rel. Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516, 516 (2007). Congress first

recognized this when it declared the rights of all qualifying children to receive a FAPE and

acknowledged the civil rights aspects of the IDEA. 20 U.S.C. § 1400(c)(6).

Congress also incorporated comprehensive procedural safeguards into the IDEA,

including the parents' right to a due process hearing (20 U.S.C. § 1415(f)(1)) and the private

right of action to bring a civil lawsuit in state or federal court (20 U.S.C. § 1415(i)(2)(A)).

Moreover, the Supreme Court has suggested that the procedural safeguards of the IDEA are just

as protected as the substantive requirement of a FAPE. *Bd. of Educ. of Hendrick Hudson Central*

*School Dist. v. Rowley,* 458 U.S. 176, 205-06 (1982); *see also Heldman v. Sobol,* 962 F.2d 148,

156 (2d Cir.1992) ("The central role of the IDEA process rights bears witness that Congress intended to create procedural rights the violation of which would constitute injury in fact.").

As students with disabilities who have been determined eligible to receive special education and related services in accordance with the IDEA (Am. Compl. ¶¶ 50, 56), it follows that H.S. and E.J. have a statutorily created right to a FAPE and the protections of the IDEA Procedural Safeguards, and the Defendants' intrusion on those rights, described in the *Amended Complaint*, constitute actual injury.

Specifically, both E.J. and H.S. allege that as a result of the "hub school" plan, they have been categorically denied the possibility of attending their neighborhood school, and additionally denied any consideration for placement in general education at any school within the district in contravention of the IDEA, 504, and ADA. (Am. Compl. ¶¶ 52, 57, 59, 90 107, 116-117, 119, 122-123, 145-146, 181-185, 200-204.) Plaintiffs also allege that as a result of SLCSD's discriminatory "hub school" system, they have been placed in overly restrictive, self-contained classrooms on the sole basis that this is the only option available to students with certain categories of disability. (Am. Compl. ¶¶ 52, 56-57, 59, 89-90, 94, 117.)

Plaintiffs further assert that the adoption of the "hub plan" has removed meaningful consideration of placement in a general education classroom, the first stop along the continuum of placements, which should be contemplated for all students. (Am. Compl. ¶¶ 181, 199.) Additionally, Plaintiffs contend that SLCSD's policy of only providing special education services to students with intellectual disabilities and/or cognitive impairments at "hub schools" has prevented any consideration of attendance at their neighborhood school for themselves and other children with intellectual disabilities and/or cognitive impairments regardless of individual

aptitude or need. (Am. Compl. ¶¶ 132-33.) Plaintiffs further allege that the "hub school" system operated by SLCSD functionally denies E.J., H.S., and other children with disabilities the same rights as their non-disabled peers. (Am. Compl. ¶ 143.)

These allegations also establish injury under Section 504 and ADA because they evince an intrusion into E.J. and H.S.'s statutorily created right to be free from discrimination on the basis of disability. Title II of the ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded in participation in . . . the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. 12132. Similarly, Section 504 provides that "[n]o … qualified individual with a disability … shall, solely by reason of her or his disability, be excluded from [] participation in … or be subjected to discrimination under any program or activity receiving federal financial assistance." 29 U.S.C. 794. Both statutes demonstrate Congressional intent to confer upon "qualified individual[s] with a disability" a legal right to be free from discrimination, the invasion of which confers Article III standing. *See Tandy v. City of Wichita*, 380 F.3d 1277, 1286-87 (10th Cir. 2004).

At issue in this case is the purposeful exclusion of students with a particular category of disability from the same access, participation, and educational opportunity that is afforded to other students precisely because of this immutable characteristic. As qualified students with disabilities, E.J. and H.S. have a legal right not to be subjected to discrimination on the basis of their disability, and the Defendants' practice of categorically denying students with intellectual disabilities and/or cognitive impairments any possibility of attending their neighborhood school

or any consideration for placement in the general education environment intrudes on that right and constitutes an actual injury.

In addition to the injuries enumerated above, which impact both H.S. and E.J., H.S. has also alleged additional concrete and particularized injuries that have resulted from the Defendants use of the "hub school" system. In the *Amended Complaint*, Plaintiff H.S. further alleges that after his parents rejected the District's proposed placement at a "hub school," the District subsequently terminated all of H.S.'s special education services. (Am. Compl. ¶ 57.) As a result, H.S. remained at his neighborhood school completely unsupported, despite a demonstrated need for special education as well as the availability of such services at the school. (Am. Compl. ¶¶ 57-58, 131.) H.S. asserts that when his parents requested a due process hearing on the issue of his alleged violations of the IDEA and ADA, he was not afforded this right because the Hearing Officer assigned to his case made a factual determination that his parents had not properly consented to special education services. (Am. Compl. ¶ 44.) Despite the fact that H.S. is aggrieved as a result of this decision, and the current civil action is an appeal of that administrative decision, Defendants argue that this case should be dismissed in its entirety, at least in part, because H.S. has not suffered an injury as a result of their discriminatory "hub school" policy. (Am. Compl. ¶¶ 46-47.) (Defs' Mot. Dismiss at 15.)

Defendants curiously contend that not only is H.S. not entitled to raise his substantive IDEA issues in a due process hearing, but also that he should not have any opportunity to appeal that decision in federal court. If this were true, then H.S. would not be entitled to process at any stage, which directly contravenes the procedural protections set forth by Congress in the IDEA.

Moreover, contrary to the Defendants' assertions, each of these intrusions into H.S.'s statutory rights constitute a concrete and particularized injury for purposes of Article III standing.

In their *Motion to Dismiss*, Defendants also inexplicably contend that Plaintiff E.J. has not alleged any concrete or particularized injuries resulting from the Defendants' use of the discriminatory "hub school" system in violation of the IDEA, Section 504, and the ADA. (Defs.' Mot. Dismiss at 15.) However, in the *Amended Complaint*, Plaintiff E.J. asserts that as a result of the "hub school" system, she has been forced to move to four different schools since enrolling in SLCSD in 2014, and that each of these moves occurred because of her assignment to the self-contained classroom for students categorized as having a "mild/moderate" disability (Am. Compl. ¶ 89.)

Second, Plaintiff E.J. alleges that the "hub school" system has resulted in her being placed in a classroom with the same small group of 6-8 students who share her disability category since Preschool, which has severely limited her social experiences. (Am. Compl. ¶ 103.) Third, Plaintiff E.J. asserts that she has requested to attend Dilworth, her neighborhood school, along with her sibling and other children in her neighborhood but has been denied the opportunity by SLCSD, thus denying her access to nondisabled peers who are part of her community. (Am. Compl. ¶¶ 94, 106.)

Additionally, Plaintiff E.J. alleges that she has been and continues to be negatively impacted by the maladaptive modeling by her classmates in her self-contained program, including bullying by one of her classmates, which has been detrimental to her, and which she cannot escape due to the "hub school" system. (Am. Compl. ¶¶ 104, 106.) Further, Plaintiff E.J. asserts that as a result of the "hub school" system, she is forced to start school very early, spends

significantly more time on the bus, and is unable to share in the experience of walking home from school with her sister and neighborhood friends. (Am. Compl. ¶¶ 100, 105.) Plaintiff E.J. also alleges that as a result of the "hub school" system, she is not being given the opportunity to attend her neighborhood school with appropriate supports and services, despite demonstrated success in her collaborative co-taught class. (Am. Compl. ¶ 105.)

In their *Motion to Dismiss*, Defendants opt to disregard this laundry list of injuries entirely, and then argue only that E.J. is being educated in the LRE as determined by her IEP team, so her placement is appropriate. (Defs.' Mot. Dismiss at 15-16.) But that argument also fails because while the Defendants may disagree that E.J. is currently being educated in the LRE, they must accept Plaintiffs' allegations as true for purposes of this motion. *See Coll*, 642 F.3d at 892.

The facts alleged in the *Amended Complaint*, including that both E.J. and H.S. are currently enrolled as students in the District (Am. Compl. ¶¶ 48, 50, 53, 58.), demonstrate that prospective relief is appropriate in this case because both student Plaintiffs remain under a "real and immediate threat of continued injury" as a result of the District's discriminatory policy. *See Colorado Cross Disability Coal. v. Abercrombie & Fitch*, 765 F. 3d 1205 (10th Cir. 2014) (An ADA testing case where the Tenth Circuit found that the Plaintiff's intent to return to a certain location 5-6 times in the future was sufficient to seek prospective relief).

As stated above, all of these allegations, taken as true, as they must be at the motion to dismiss stage, suffice to state an injury-in-fact for purposes of Article III standing. *Petrella v. Brownback*, 697 F.3d 1285, 1293 (10th Cir. 2012).

**Plaintiff E.J. and H.S.'s Injuries are Traceable to the Action of the Defendants**

The causation prong of Article III standing requires that the injury be "fairly traceable to the challenged action of the defendant." *Petrella*, 697 F.3d at 1293(citing *Lujan*, 504 U.S. at 560). As pled, SLCSD's discriminatory "hub school" system is the source of E.J. and H.S.'s alleged injuries, and but for the District's policy of only providing special education services for children with intellectual disabilities and/or cognitive impairments at a few "hub schools," E.J., H.S., and other similarly situated students would be able to attend their neighborhood schools with appropriate supports and services. (Am. Compl. ¶¶ 132-33.) This is sufficient to meet the causation requirement at this stage in the litigation. *See Petrella*, 697 F.3d at 1293.

**Plaintiff E.J. and H.S.'s Claims are Redressable Because the Relief Sought is Available under the IDEA, 504, and ADA and it is Likely that Their Injury Will Be Addressed by a Favorable Decision**

To establish redressability, "a plaintiff must ... establish it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561. A plaintiff seeking injunctive relief satisfies the redressability requirement "by alleging a continuing violation or the imminence of a future violation of an applicable statute or standard." *NRDC v. Sw. Marine*, 236 F.3d 985, 995 (9th Cir. 2000). Here, Plaintiffs have satisfied the redressability prong because they have requested relief that is available and is likely to remedy the injuries resulting from Defendants' discriminatory practices.

In their *Motion to Dismiss*, Defendants argue that all three of Plaintiff E.J. and H.S.'s claims fail on redressability because the relief requested is "simply not available . . . under the IDEA, Section 504, or the ADA." (Defs.' Mot. Dismiss at 17.) As discussed, *supra*, Defendants incorrectly assert that the relief sought by Plaintiffs is "the recognition of the *absolute right* of

parents and children who receive special education and related services under the Individuals with Disabilities Act to be educated at their neighborhood schools." (emphasis added.) (Defs.' Mot. Dismiss at 1, 2, 12.) Defendants contend that since this "absolute right" is not one that is granted to any of the Plaintiffs under the IDEA, Section 504 of the Rehabilitation Act, or Title II of the Americans with Disabilities Act, then the Plaintiffs' claims are not redressable. (*See generally* Defs.' Mot. Dismiss.)

There are several problems with this argument. As a threshold issue, Plaintiffs have never claimed that there is an absolute right to placement in their neighborhood school, and Defendants' repeated attempts to frame the issue in that way is nothing more than a transparent attempt to fit this case within an inapplicable legal framework.[2]

Additionally, Defendants falsely assert in their *Motion* that the injunctive relief sought by the student Plaintiffs is "an order that the District educate their children (and all similarly situated children) at each child's neighborhood school." (Defs.' Mot. Dismiss at 23.) This statement is not only inaccurate, but also clearly misstates the relief requested by the Plaintiffs. The actual request for injunctive relief made by the Plaintiffs was for the Court to "[o]rder SLCSD to make individualized placement decisions for each of the Plaintiffs based on their IEPs

---

[2] It is well established that "[a]n amended complaint supersedes the original complaint and renders the original complaint of no legal effect." *See Franklin v. Kansas Department of Corrections*, 160 App'x 730, 730 (10th Cir. 2005). Nonetheless, Defendants' *Motion to Dismiss* incorporates improper references to the previously filed complaint in an attempt to advance their inaccurate theory of the case, and also to prejudice Plaintiffs. (Defs.' Mot. Dismiss at 5.) Moving forward, Defendants should only refer to allegations, claims, and arguments contained in the Amended Complaint.

and meaningfully consider the full continuum of placement options and supplementary aids and services necessary to place them at their neighborhood schools." (Am. Compl. p. 44, §VVI.E.).

As such, there is nothing that prevents the Court from ordering the requested relief, which undermines Defendants' entire argument as to both the injunctive and declaratory relief requested. The Court can, in fact, order the District to make individualized placement decisions and consider the full continuum of placement options; similarly, the Court can permanently enjoin Defendants from "denying Plaintiffs and similarly situated students with the school-based services they need in to enjoy equal educational opportunity to their non-disabled peers and to receive appropriate educational programs and services in the most integrated setting and least restrictive environment as required by the IDEA, Rehab Act, and Title II of the ADA. (Am. Compl. p. 44, §VVI.D.) Since there is an available remedy for the Plaintiffs, this case is easily distinguished from *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83 (1998), cited by Defendants in their *Motion.* Here, the declaratory judgments requested are not "worthless" because they provide the basis of an actual remedy for the plaintiffs. *See generally, id.* at 106.

Further, it is likely and not just speculative that a favorable decision on the merits could redress E.J. and H.S.'s alleged injuries. The requested injunctive relief would remedy the alleged injuries to E.J. and H.S., including the denial of the right to an individualized placement determination and consideration of placement at their neighborhood schools that have been caused by from the District's discriminatory "hub" system. For instance, if the Court were to order the District to make individualized placement decisions for each of the Plaintiffs and those similarly situated students with cognitive impairments and/or intellectual disabilities, the District would be prevented from violating the IDEA by passing over the first stop on the continuum of

placements for students with intellectual disabilities and/or cognitive impairments in order to comply with the "hub plan." Additionally, if Defendants were enjoined from denying Plaintiffs and similarly situated students with the school-based services they need in to enjoy equal educational opportunity as compared to their non-disabled peers and to receive appropriate educational programs and services in the most integrated setting and least restrictive environment, Plaintiffs would have the opportunity to interact more fully with their non-disabled peers.

In the case of H.S., it is worth noting that Defendants argue not only that H.S. did not suffer any injuries, discussed *supra*, but also contend that since he is currently being educated in his neighborhood school, an injunctive order from the Court would not change his placement, and therefore there is no remedy available for him. (Defs.' Mot. Dismiss at 22.) However, this is entirely inaccurate. If the Court were to order the injunctive relief requested by Plaintiffs, H.S. would have the opportunity to be placed at his neighborhood school with appropriate special education services and supports, a right which he has been denied by the District, and which forms the basis of his injury. At present, H.S. is not receiving any special education, and has been forced to choose between attending his neighborhood school and receiving special education services; accordingly, such an order would redress the injury.

Finally, Plaintiffs seek not only declaratory and injunctive relief against the Defendants, but also "any other relief which is necessary and appropriate to protect the federal rights of Plaintiffs and similarly situated individuals." (Am. Compl. p. 44, §VI.H.) In *Petrella*, 697 F.3d at 1295, the Tenth Circuit explained that "[e]quitable relief can take many forms, and at this

early stage of the proceeding the court should not assume it will be unable to fashion relief that could remedy any . . . violation found." *Id.* at 1295.

**Conclusion**

As provided above, the standing inquiry at the motion to dismiss stage asks only whether the plaintiff has sufficiently alleged a cognizable injury, fairly traceable to the challenged conduct that is likely to be redressed by a favorable judicial decision. *See Lujan*, 504 U.S. at 560–61. Accordingly, Plaintiffs have alleged facts sufficient to meet that burden and the Defendants' 12(b)(1) *Motion* should be denied.

**B. PLAINTIFF DLC**

For an entity such as Plaintiff DLC, standing can be established in three ways: as an individual plaintiff, as an association representing the interests of its constituents, and as an organization. Plaintiff DLC contends that it can establish all three types of standing, although it need only establish one of the three.

**Plaintiff DLC Can Show Individual Standing Per Statutory Authority Under the Protection and Advocacy for Individuals with Developmental Disabilities Act Created by the Developmental Disabilities Assistance and Bill of Rights (DD) Act**

"Congress may grant an express right of action to persons who otherwise would be barred by prudential standing rules. Of course, Art. III's requirement remains: the plaintiff still must allege a distinct and palpable injury to himself, even if it is an injury shared by a large class of other possible litigants." *Warth*, 422 U.S. at 501. However, when Congress conferred upon P&A systems the authority to bring litigation in their own right in order to advocate on behalf of persons with disabilities, an injury was not required to be shown, thus rendering prudential concerns irrelevant:

The Department, however, points out that the legislative history of the 1994 DD Act Amendments (Sen. Rep. No. 103–120, 103rd Cong., 2d sess., 39–40, reprinted in 1994 U.S. Code Cong. and Admins. News at 164, 202–203), strongly supports the view that, without showing injury to itself, a P&A system does have standing to bring suit on behalf of persons with disabilities. Although Congress declined to amend the DD Act to insert a right of standing, the report stated that "the current statute is clear that P&A systems have standing to pursue legal remedies to ensure the protection of and advocacy for the rights of individuals with developmental disabilities within the state."  62 Fed. Reg. 53553 (Oct. 15, 1997).

This expressed intent of Congress is also confirmed in the regulations implementing the Developmental Disabilities Assistance and Bill of Rights Act, which includes a provision confirming P&A systems' independent standing authority under the Act:

§ 1386.25 Allowable litigation costs. Allotments may be used to pay the otherwise allowable costs incurred by a Protection and Advocacy System *in bringing lawsuits in its own right to redress incidents of abuse or neglect, discrimination and other rights violations impacting on individuals with developmental disabilities* to obtain access to records and *when it appears on behalf of named plaintiffs or a class of plaintiff for such purposes*. State System for Protection and Advocacy of the Rights of Individuals with Developmental Disabilities, 45 C.F.R. § 1386.25 (2009) [61 FR 51159, Sept. 30, 1996] (emphasis added.)

Thus, Plaintiff DLC can show individual Article III standing.

### **Plaintiff DLC Can Show Associational Standing Via the *Hunt* Factors**

"[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advertising Comm'n.*, 432 U.S. 333, 343 (1977). P&A systems are membership organizations in that they advocate for and protect the legal rights of people with disabilities, including developmental disabilities, in consultation with individuals with disabilities and their family members. (Am. Compl. ¶ 60.) Constituents are consulted in

identifying organizational priorities through space reserved on Plaintiff DLC's governing board and by public comment garnered by Plaintiff DLC. (Am. Compl. ¶ 60.)

First, as discussed *supra*, individual student Plaintiffs have standing to sue in their own right. As such, similarly situated constituent plaintiffs would also otherwise have standing. (Am. Compl. ¶ 67.) While Defendants insist that this court base a decision about Plaintiff DLC's associational standing on their certainty that individual student Plaintiffs do not have standing, this question is currently at issue in the subject *Motion*. (Defs.' Mot. Dismiss at 23.) The suggestion that Plaintiff DLC does not have standing based on an issue that has not been decided yet is premature.

Second, Plaintiff DLC is authorized by Congress to "pursue legal, administrative, and other appropriate remedies or approaches to ensure the protection of, and advocacy for, the rights of [individuals with developmental disabilities] within the State who are or who may be eligible for treatment, services, or habilitation." 42 U.S.C. § 15043(a)(2)(A)(i). (Am. Compl. ¶ 61.) The DLC advocates for and protects the legal rights of people with developmental disabilities, which includes intellectual disabilities and/or cognitive impairments. (Am. Compl. ¶ 62.) As such, the interests Plaintiff DLC seeks to protect are germane to the organization's purpose.

Third, the alleged violations are systemic in nature and cannot be remedied through the IDEA, thus rendering exhaustion futile and triggering the systemic exception to the IDEA exhaustion requirement. (Am. Compl. ¶ 27.) The overarching and inescapable violation in this case is about how the District treats all children in a particular disability category under their "hub" plan, and the District themselves have made it clear that the individual nature of these students' needs matter not. (Am. Compl. ¶¶ 205, 207-210.) Families in the District with students

with developmental disabilities have sought out Plaintiff DLC to make it aware of the hubbing

that is occurring with regard to students of certain disability categories. (Am. Compl. ¶ 66.)

These families have expressed concern that there is no path to resolution for their individual

student that does not involve some systemic legal action that is larger than their student

individually. (Am. Compl. ¶¶ 66, 69.)

     The District completely bars access to the general education classroom, the first stop on

the continuum of placement, and strictly adheres to a policy that puts children with intellectual

disabilities and/or cognitive impairments in a placement and location chosen for them based on

administrative convenience and not individual IEP needs. (Am. Compl. ¶¶ 199-206, 208-210.)

This is the exact definition of a claim that does not require individual inquiry and proof, but

instead an analysis of how the existing policy affects, segregates, and discriminates against

students with developmental disabilities writ large. And yet, when the District's service delivery

consolidation, or "hub" system, was raised during E.J.'s IDEA due process hearing, the District

objected and attempted to limit the scope of the questioning to E.J., and the hearing officer

narrowed the scope of the questions and witness testimony to E.J. alone. (Am. Compl. ¶¶ 35-36.)

     In an effort to avoid a systemic exception, Defendants attempt to analogize the present

case to *Parent/Professional Advocacy League v. City of Springfield, Mass.*, 934 F.3d 13 (1st Cir.

2019). There, a parent advocacy group, a disability law center, and individual plaintiffs brought

suit challenging a district's policy of segregating students with mental health disabilities in a

separate and inferior school, and included in their request for relief that the court issue an order

that defendants be required to provide plaintiffs with school-based behavior services in

neighborhood schools. *Id.* at 17-18. The court determined that the systemic exception to the

IDEA exhaustion requirement did not apply because such alleged violations must be "truly systemic…in the sense that the IDEA's basic goals are threatened on a systemwide basis . . . Suits labeled "systemic" also tend to challenge policies or practices, or administrative failures at the highest administrative level." *Id.* at 27 (internal quotation marks and citations omitted). There, the court stated that a finding that one student should be mainstreamed did not mean that another student should automatically receive identical services or be mainstreamed as well. *Id.*

The present case is distinguishable, as the injunctive relief requested is an order that the district make individual placement decisions under the IDEA and meaningfully consider the full continuum of placement options a student with an intellectual disability and/or cognitive impairment might need – which is not a request to order a specific placement or location, but instead for the District to appropriately engage in the individual considerations that are foundational to the goals of the IDEA. (Am. Compl. ¶¶ 199-204, 208-210, p. 44 §VVI.E.) Plaintiffs bring this suit to challenge the District's hub plan, a systemic policy, and an administrative failure at the highest administrative levels of SLCSD.

If the District were adhering to the requirements of the IDEA, ADA, and Section 504, then perhaps individual claims would be appropriate. However, Defendants have created a systemic policy of treatment of an entire disability category of students, and the only way to address such a systemic issue is via associational or organizational standing on behalf of such students. Defendants suggest that "as evidenced by the detailed allegations of the *Amended Complaint*, the claims asserted are fact specific and required individual inquiry and proof." (Defs.' Mot. Dismiss at 25.) While Defendants are not wrong that the record is replete with detailed allegations as to the IDEA, that is to be expected, as Plaintiffs have only had the

opportunity to develop the record as to individual IDEA violations because that is the only process that has been made available to them. (Am. Compl. ¶¶ 29-31.) Plaintiffs now appeal their IDEA due process rulings and bring their systemic ADA and Section 504 claims to federal court. (Am. Compl. ¶¶ 39, 47.) Therefore, to address this systemic policy matter, the current jurisdiction, with Plaintiff DLC having established associational standing on behalf of constituents affected by SLCSD's policy, is proper.

**<u>Plaintiff DLC Can Show Organizational Standing</u>**

To establish organizational standing, an organization needs to show that the challenged conduct frustrated their organizational mission and also that they diverted resources to combat that conduct. *See Havens*, 455 U.S. at 379. A "concrete and demonstrable injury to [an] organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests." *Id.* "To determine whether an organization's injury is 'concrete and demonstrable' or merely a 'setback' to its 'abstract social interests,' we ask, first, whether the agency's action or omission to act 'injured the [organization's] interest' and, second, whether the organization 'used its resources to counteract that harm.'" *People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1094 (D.C. Cir. 2015) (citing *Equal Rts. Ctr. v. Post Properties, Inc.*, 633 F.3d 1136, 1140 (D.C. Cir. 2011)). If an organization expends resources to this end "rather than in anticipation of litigation, it has suffered a concrete and demonstrable injury that suffices for purposes of standing," *PETA*, 797 F.3d at 1097 (internal quotation marks and citations omitted.)

Defendants argue that Plaintiff DLC does not have individual or associational standing, but they do not make a cognizable argument against organizational standing. They do, however,

suggest that Plaintiff DLC has not suffered or alleged a legally recognizable injury in fact, and insist the only damages alleged by Plaintiff DLC is a distinct economic injury with regard to expending time and resources on this case. (Defs.' Mot. Dismiss at 16.) They also suggest this is not a particularized or concrete injury, and that Plaintiff DLC's mission and purpose will not change based on the outcome of this lawsuit. (Defs.' Mot. Dismiss at 17.)

The DLC advocates on behalf of its constituents through legal action, advocacy, and outreach under many federal statutes, and requests for assistance from Utahns with disabilities total around 4,000 each year. (Am. Compl. ¶ 64.) The focus of Plaintiff DLC's work and where staff time and resources are spent is in large part driven by constituent and community input. (Am. Compl. ¶¶ 60, 68.) Strategic plans change every three to five years based on public input, and case criteria changes yearly based on funding available, most egregious violations present in the community and identified by constituents, and other specifically mission-driven decisions. When the District's systemic and discriminatory "hub plan," a policy that puts children with intellectual disabilities and/or cognitive impairments in a placement and location chosen for them based on administrative convenience and not individual needs, was codified in 2019, the DLC's mission was directly implicated, and resources immediately diverted to begin to understand and address this violation identified by constituents and community partners. (Am. Compl. ¶¶ 65-66; 146.) From 2019 to present, DLC has expended its organizational resources to combat the harm caused by the District's policy, including via informal and administrative interventions, research, individual client representation, attempts at negotiation with the District, engagement of experts in the field of inclusion, due process hearings, and now the instant case. (Am. Compl. ¶ 70.) These actions were not taken in anticipation of litigation, but instead in an attempt to remedy the

systemic harm caused by the District's "hub" plan. The District's "hub" plan operates in direct contravention to concepts of inclusion, opportunities, and autonomy which are core to Plaintiff DLC's work.

Defendants assert that Plaintiff DLC fails on redressability both because Congress does not allow recovery of pre-litigation investigatory and advocacy fees and expenses, and also because an interest in attorney fees is insufficient to create an Article III case or controversy, citing *Thole v. U.S. Bank N.A.* 140 S.Ct. 1615 (2020) and *Steel Co. v. Citizens for a Better Environment* 523 U.S. 83 (1998) to support this proposition. (Defs.' Mot. Dismiss at 17-19.) In *Steel*, plaintiffs were an environmental organization who brought suit against a steel manufacturer for failure to make required reporting. *Steel*, at 86. Before the case reached federal court, defendants had filed all of the relevant back-due forms. *Id.* at 88. Plaintiffs' primary claimed injury was a deprivation of information during the period of time when the reports were not filed. *Id.* at 105. Accordingly, none of the relief sought, including inspection authorization, an order to provide copies to plaintiffs, civil penalties, or an award of costs, would reimburse the losses caused by the late reporting or eliminate any effects of that late reporting on plaintiffs. *Id.* at 105-106, 108. Defendants misconstrue *Steel* when they state that the *Steel* Court recognized that relief that is injunctive in nature cannot remedy a past wrong.  (Defs.' Mot. Dismiss at 19.) In *Steel*, all wrongs were past wrongs, and there were no future violations contemplated.  *Steel*, at 86. The instant case is distinguishable for a number of reasons, including the ongoing nature of the harm to Plaintiffs, where current and future violations continue to be the gravamen of the complaint. (Am. Compl. ¶¶ 66, 69, 143-145, p. 43 §VVI.D.) What Defendants frame as simply "pre-litigation investigatory and advocacy fees and expenses" are in fact part of a host of injuries

incurred by Plaintiff DLC as a result of combatting the systemic harm caused by the District's hub plan. (Am. Compl. ¶ 70.) To prevail in this case would advance the DLC's mission by remedying systemic harm and fostering inclusion and opportunities for students with developmental disabilities, as well as allow the DLC to redistribute its personnel and financial resources to issues that have been necessarily ignored while combatting this harm, thus providing redress for Plaintiff DLC's injury. As such, Plaintiff DLC can establish organizational standing.

## IV.   EXHAUSTION OF PLAINTIFFS' SECTION 504 CLAIMS WOULD HAVE BEEN FUTILE

### Plaintiffs' Section 504 Claim Alleges Systemic Violations and Is Therefore Exempt from Exhaustion

The Court must not dismiss Plaintiffs' Section 504 claim, as the underlying alleged violations are systemic in nature and cannot be remedied through the IDEA, rendering exhaustion futile and thereby triggering the systemic exception to the exhaustion requirement. The Tenth Circuit described the systemic exception in 1994 in *Association for Community Living v. Romer*: "Administrative remedies are generally inadequate or futile where plaintiffs allege structural or systemic failure and seek systemwide reforms." *Ass'n for Cmty. Living in Colo. v. Romer*, 992 F.2d 1040, 1044. However, a plaintiff cannot bypass exhaustion merely by framing deficiencies in an individual student's educational program as a manifestation of systemic violations at the administrative level; rather, plaintiffs must demonstrate that "the policy is contrary to law and that the underlying purposes of exhaustion would not be served." *Id*. In *Romer*, the Tenth Circuit further clarifies that the type of situation where "the underlying purposes of exhaustion would not be served" by requiring exhaustion is where the alleged

systemic violation(s) "raise only questions of law, thereby rendering agency expertise and the factual development of an administrative record less important." *Id*.

Defendants argue that because Plaintiffs' Section 504 claim raises issues involving the structure and operations of the District's educational programs, which in turn affect the delivery of special education services on an individual level, this means that the claim "clearly seeks relief that implicates FAPE and could have been remedied by the IDEA." (Defs.' Mot. Dismiss at 28.) Because of this, Defendants argue that the claim is in fact an IDEA least restrictive environment claim masquerading as a systemic civil rights claim, concluding that because "the allegations involve [students'] educational programming," they are therefore subject to exhaustion. Defendants misstate the relevant standard for analyzing whether a non-IDEA claim in a school-related case is subject to the exhaustion requirement: a claim is not automatically subject to exhaustion merely because it "involve[s students'] educational programming." (Defs.' Mot. Dismiss at 28.) Were that the case, it would be functionally impossible for a student plaintiff to ever satisfy the systemic exception in a case against a public school district, as every possible claim a student could bring against their school district would necessarily involve educational programming in some way, whether directly or indirectly. Rather, the correct standard was articulated by the Supreme Court in *Fry v. Napoleon Community Schools*: "In determining whether a suit seeks relief for such a denial [of FAPE], a court should look to the substance, or gravamen, of the plaintiff's complaint." 580 U.S. 154, 752 (2017).

In *Fry*, the Supreme Court rejects the idea that any claim which involves a student's education in some way is automatically subject to exhaustion, applying the example of a hypothetical student who uses a wheelchair:

> Suppose first that a wheelchair-bound child sues his school for discrimination under Title II (again, without mentioning the denial of a FAPE) because the building lacks access ramps. In some sense, that architectural feature has educational consequences, and a different lawsuit might have alleged that it violates the IDEA: After all, if the child cannot get inside the school, he cannot receive instruction there.

*Id.* at 756. From this, the Court concludes "[c]onsider that the child could file the same basic complaint if a municipal library or theater had no ramps…That the claim can stay the same in those alternative scenarios suggests that its essence is equality of access to public facilities, not adequacy of special education." *Id.* From this, it is abundantly clear that the Supreme Court did not intend to extend the IDEA's exhaustion requirement broadly to every non-IDEA claim which "involves educational programming," and therefore Defendants' argument to that effect lacks merit. The core distinction is that IDEA claims rely extensively on the unique circumstances of individual students and therefore require a "factually intensive inquiry" with respect to individual cases, whereas true systemic claims present a "purely legal question" which can be answered as to any student in any school district. *Romer*, 992 F.2d at 1044. In other words, a claim which does meet the standard, such as one for failure to provide ramps at school buildings, would be essentially the same for any student with the same type of disability, regardless of their individual circumstances – while the outcome of a claim grounded in FAPE under IDEA necessarily turns on the highly specific situation of an individual student or students.

As noted above, courts have generally held that exhaustion of administrative remedies is futile "where plaintiffs allege structural or systemic failure and seek systemwide reforms." *Id*. Because the due process procedures available under the IDEA are by nature designed to address FAPE issues with respect to an individual student, a plaintiff cannot raise systemic concerns in a due process hearing except as they pertain to the individual student in question. Furthermore, a

hearing officer would have authority to award relief only with respect to the individual student, and individual relief by definition cannot remedy systemic violations; instead, to address systemic violations would require the district to restructure its system at the administrative level, a remedy which is not available under the IDEA. This is of course why exhaustion is considered futile with respect to systemic violations. In this case, both E.J. and H.S. have been categorically denied both the opportunity to be placed in general education as well as the opportunity to attend their neighborhood schools with special education services, not because they cannot receive a FAPE there but because the District's system forecloses the possibility at the outset. In other words, this case would never have arisen if not for a system-wide policy that prevents the IEP teams of students with intellectual disabilities and/or cognitive impairments from even considering a general education placement or attendance at the neighborhood school, thereby ensuring that all students identified in these disability categories receive a one-size-fits-all education. Remedying the District's discriminatory hub school system is not a type of relief available through the IDEA's individual administrative process.

As then-special education director Shelly Halverson explained on the very day the hub plan was announced, students whose needs exceeded a certain threshold would be categorized as either "mild/moderate" or "severe" and assigned to a hub school according to their category. (Am. Compl. ¶¶ 153-154.) Ms. Halverson also acknowledged that these new program assignments would be made entirely based on category membership and without regard to individual needs: "So, regardless of a student's disability, they would go to one of these hubs." (Am. Compl ¶ 158.) Later, in E.J.'s due process hearing, Ms. Halverson confirmed that the District uses students' IQ score to determine placement: students with an IQ of at least 70 are

categorized as "mild/moderate" and assigned to "Academic Support," while those with an IQ at or below 70 are categorized as "severe" and assigned to "Essential Elements." (Am. Compl. ¶¶ 155-156.) Once categorized, the possibility of one of these students attending their neighborhood school with supports is foreclosed entirely. (Am. Compl. ¶ 181.) The use of IQ scores as the principal factor in determining placement, in combination with testimony from District employees at E.J.'s due process hearing that they would never consider general education for a student with an intellectual disability and/or cognitive impairment, makes it clear that the hub school plan specifically targets students with intellectual disabilities and/or cognitive impairments, systematically segregating them from other students. (Am. Compl. ¶¶ 182-183.)

Because the hub school plan affects all students in the District in the same disability category in the same way, the circumstances in this case therefore more closely resemble that of the hypothetical wheelchair user in *Fry*, which the Supreme Court offered as an example of a "purely legal question." For the purposes of Plaintiffs' Section 504 claim, the specific students E.J. and H.S. could be swapped with any of the hundreds of other students with cognitive disabilities in the District who, like E.J. and H.S., had their educational futures simultaneously dictated when the District announced its hub school plan in March 2019, and the underlying facts would not change. As for E.J. and other students who were already enrolled in the district at the time the plan was announced, these students were concurrently reassigned to hub schools and had new placements predetermined months before IEP meetings were ever held to discuss the potential pros and cons of assigning each individual student to a "collaborative classroom," the sole type of program to which the District assigns all of its students which it has categorized as exhibiting "mild/moderate" intellectual disabilities and/or cognitive impairments.

While it is true that federal law does not guarantee that an IEP team will ultimately place a student at their neighborhood school after discussing the student's individual needs, students do have the right for a general education placement and attendance at their neighborhood school to be meaningfully considered when the IEP team determines their placement. 34 C.F.R. §§ 104.34(a); 300.116 (c). Yet, students with intellectual disabilities and/or cognitive impairments are systematically denied the right to have their individual needs considered at every step of the process, and are instead funneled into one particular type of placement. (Am. Compl. ¶ 202.) Students without intellectual disabilities and/or cognitive impairments have the option to receive services at their neighborhood school via a resource model in a general education placement. (Am. Compl. ¶¶ 131, 207.) However, students with intellectual disabilities and/or cognitive impairments are not given the same choice. Instead, they are required to accept a placement at a segregated hub school and subsequent removal from the general education environment or choose to remain at their neighborhood school with friends and family but receive no special education services or supports. (Am. Compl. ¶¶ 95, 116, 133-134.)

Finally, the Complaint does not demand, as Defendants repeatedly insist, that the District "unilaterally change the classroom of hundreds of students assigned by their IEP Team to a self-contained classroom without any consideration for whether the classroom at their neighborhood school is actually an appropriate setting for each [student]." (Defs.' Mot. Dismiss at 29.) The irony of presenting this particular argument is apparently lost on Defendants: unilaterally changing the school assignment and placement of hundreds of students without reference to their individual needs is precisely what the district did when it implemented the hub school plan, which Plaintiffs are now attempting to challenge in this suit. Rather, Plaintiffs are requesting that

the District do the bare minimum required by the law and start from the beginning, by designing

students' educational programs according to their individual needs, rather than simply attempting

to fit them into a predetermined structure which deprives them of opportunities and experiences

that their peers without intellectual disabilities and/or cognitive impairments regularly enjoy, in

violation of Section 504's guarantee of an education that is at least "as adequate" as that offered

to their nondisabled peers.

Accordingly, Plaintiffs have pled a systemic violation for which exhaustion would be

futile, and therefore this Court must deny Defendants' *Motion* as to Plaintiffs' Section 504 claim.

### Defendants Failed to Provide Timely Notice of Procedural Safeguards Regarding Section 504 Due Process Requests

Neither E.J. nor H.S. were provided notice of the District's Section 504 due process

procedures and associated deadlines, and therefore had no opportunity to pursue Section 504 due

process, rendering exhaustion not only futile but impossible. (Am. Compl. ¶¶ 29-31.) This means

that Plaintiffs would have had to administratively exhaust with respect to Section 504 without

knowing this was a requirement. At no point did E.J. receive notice of the existence of a separate

Section 504 due process procedure; the procedural safeguards document provided with each of

E.J.'s IEPs and her prior written notice did not reference a Section 504 due process procedure.

(Am. Compl. ¶ 29.) Similarly, H.S.'s parents did not receive notice of the District's Section 504

procedural safeguards with his prior written notice. (Am. Compl. ¶ 30.)

Moreover, the procedural history demonstrates that IDEA due process would be

inadequate to provide relief for Plaintiffs' Section 504 claims; even if Plaintiffs had raised these

claims at the hearing, the hearing officer would have immediately dismissed the claims for lack

of jurisdiction. This is evidenced by the fact that the hearing officer dismissed E.J.'s claims as to similarly situated students, as well as claims of systemic discrimination under the ADA, stating "Neither of these requests for relief shall be heard in this matter for want of jurisdiction." (Am. Compl. ¶ 33.) Since the Section 504 claim is materially similar to the ADA claim which was dismissed, it is highly unlikely that a Section 504 claim would have fared any better. This further confirms the truly systemic nature of Plaintiffs' Section 504 claim as well as the inadequacy of the IDEA dispute resolution process to provide the requested relief. *Heldman on Behalf of T.H. v. Sobol*, 962 F.2d 148, 159 (2d Cir. 1992). For these reasons, this Court should find that exhaustion is not required and therefore deny Defendants' *Motion to Dismiss* as to Plaintiffs' Section 504 claim.

## V.   <u>CONCLUSION</u>

For the foregoing reasons, Defendants' *Rule 12(b)(1) and 12(b)(6) Motion to Dismiss the Amended Complaint (DOC. 27) and Memorandum in Support* should be **DENIED**. The Defendants should be required to answer the Complaint. Plaintiffs should be permitted to proceed with discovery.

RESPECTFULLY SUBMITTED this 20th day of July 2022.

By <u>/s/ Laura Henrie</u>
LAURA HENRIE (Bar No. 12449)
NATE CRIPPES (Bar No. 14622)
MICHELLE C. MARQUIS (Bar No. 16889)
KATIE COX (Bar No. 17188)
MAYA ANDERSON (Bar No. 17559)
**DISABILITY LAW CENTER**
*Attorneys for Plaintiffs*

<u>PLS.' MEM. OPP'N DEFS.' MOT. DISMISS</u>, Page 39

<u>CERTIFICATE OF SERVICE</u>

I, <u>Laura Henrie</u>, hereby certify that I caused a true and correct copy of the foregoing

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' RULE 12(B)(1) AND

12(B)(6) MOTION TO DISMISS THE AMENDED COMPLAINT (DOC. 27) AND

MEMORANDUM IN SUPPORT to be served via e-mail to counsel for the parties in this action

on this 20th day of July 2022.

Joan M. Andrews
Matthew S. Brahana
FABIAN VANCOTT
215 South State Street, Suite 1200
Salt Lake City, Utah 84111
Telephone: (801) 531-8900
Facsimile: (801) 531-1716
jandrews@fabianvancott.com
mbrahana@fabianvancott.com


<u>/s/ Laura Henrie</u>
Disability Law Center