IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| KRISTIN JACOBS, legal guardian of E.J.; AMANDA SANDY, legal guardian of H.S.; and DISABILITY LAW CENTER;<br><br>Plaintiffs,<br><br>v.<br><br>SALT LAKE CITY SCHOOL DISTRICT and BOARD OF EDUCATION OF SALT LAKE CITY SCHOOLS,<br><br>Defendants. | MEMORANDUM DECISION AND ORDER GRANTING MOTION TO DISMISS<br><br>Case No. 2:21-cv-00706-JNP-CMR<br><br>District Judge Jill N. Parrish |

Before the court is a motion to dismiss filed by the Salt Lake City School District (SLCSD) and the Board of Education of Salt Lake City Schools (collectively, the defendants). ECF No. 32. The court GRANTS the motion and dismisses the action brought by plaintiffs E.J., H.S. and the Disability Law Center (DLC).

## BACKGROUND[1]

In the Spring of 2019, the SLCSD announced that special education services for students with cognitive disabilities would be provided in a handful of "hub" schools. E.J. is a student in the school district who has been categorized as having a "mild/moderate" cognitive disability. The school district informed E.J.'s parents that special education services would be provided to E.J. at one of the hub schools. E.J.'s parents requested that she receive special education services in her

---

[1] The court recites the facts based on the allegations of the Amended Complaint.

neighborhood school so that she could attend school with her sister and other children in her neighborhood. The SLCSD told E.J.'s parents that E.J. would have to go to a hub school in order to receive special education services and that if she attended her neighborhood school, those services would be reduced or removed. E.J.'s parents agreed to send their daughter to the hub school in order to receive special education services.

H.S. is also a student in the SLCSD. He began attending his neighborhood school in August 2019. In September 2019, the school district informed H.S.'s parents that it had categorized H.S. as having a severe cognitive disability and that he needed to be transferred to a hub school to participate in an educational program designed for his disability level. When H.S. parents objected to moving their son to a hub school, the SLCSD terminated the limited services the district had been providing to H.S. He continued to attend his neighborhood school without receiving any special education services.

The parents of E.J. and H.S. wrote letters to the defendants requesting due process hearings. In these letters, the parents raised concerns that the SLCSD's hub system improperly removed students like E.J. and H.S. from their neighborhood schools and isolated them from their nondisabled neighborhood peers. Accordingly, the parents asserted that the hub system violated the rights of E.J. and H.S. under Title II of the Americans with Disabilities Act (ADA) and under the Individuals with Disabilities Education Act (IDEA). The parents exhausted the administrative remedies for E.J.'s and H.S.'s ADA and IDEA claims by raising these arguments in the due process hearings with the SLCSD.

The DLC is a nonprofit corporation that has been designated as Utah's protection and advocacy system. It is a federally authorized and funded organization established under the Protection and Advocacy for Individuals with Developmental Disabilities Act. The DLC advocates

for and protects the legal rights of disabled individuals in Utah. In December 2021, E.J., H.S., and the DLC filed a lawsuit against the defendants. Asserting claims under (1) Title II of the ADA, (2) Section 504 of the Rehabilitation Act (Section 504), and (3) the IDEA, the plaintiffs ask the court to order the defendants to make individualized placement decisions for E.J. and H.S. and to meaningfully consider providing special education services to them in their neighborhood schools.

## ANALYSIS

The defendants move to dismiss the claims against them for three reasons. First, the defendants argue that the court should dismiss this action under Rule 12(b)(1) of the Federal Rules of Civil Procedure because the plaintiffs lack standing to bring this lawsuit. Second, they argue that the court should dismiss the Section 504 claim because the plaintiffs failed to exhaust their administrative remedies. Third, the defendants argue that the court should dismiss the action under Rule 12(b)(6) because the relief requested by the plaintiffs is not available to them.

**I.   STANDING**

Article III of the Constitution limits a federal court's authority to resolve legal claims to actual cases or controversies. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337 (2016). This constitutional limitation on a federal court's subject-matter jurisdiction requires courts to ascertain whether a plaintiff has standing to sue. *See id.* at 338. "[T]he 'irreducible constitutional minimum' of standing consists of three elements. The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id*. (citation omitted).

"The party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). "At the pleading stage, the plaintiff must 'clearly allege facts demonstrating' each element." *Spokeo*, 578 U.S. at 338 (cleaned up) (citation

omitted). Because the defendants have mounted a facial attack to the plaintiffs' standing to sue, the court assumes that the factual allegations of the operative complaint are true and considers whether these facts are sufficient to establish jurisdiction. *See Baker v. USD 229 Blue Valley*, 979 F.3d 866, 872 (10th Cir. 2020). The defendants argue that the allegations in the Amended Complaint do not establish the elements of standing for either the individual defendants—E.J. and H.S.—or the DLC.

    A.    E.J. and H.S.

The defendants assert that E.J. and H.S. have not satisfied either the injury in fact or the redressability requirements for standing.

    1)    Injury in Fact

"To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 578 U.S. at 339 (citation omitted). "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'" *Id.* (Citation omitted). For an injury to be concrete it must real rather than abstract. *Id*. at 340. The defendants argue that E.J. and H.S. have not pled facts showing they have suffered concrete and particularized injuries. The court disagrees.

    E.J. alleges that because the SLCSD rigidly enforces its hub system for providing special education services, she must get up earlier, spend significantly more time on a bus to reach her school, and is denied the opportunity to walk home from school with her sister and neighborhood friends. She further alleges that the hub school that she attends is detrimental to her education because she is negatively impacted by maladaptive modeling and bullying by her classmates and is denied the opportunity to associate with her nondisabled neighborhood peers while at school.

4

H.S. also alleges that he is harmed by the SLCSD's inflexible enforcement of the hub system. When his parents declined to transfer H.S. to a designated hub school, the district terminated the limited special education services that had been provided to him in his neighborhood school. Thus, the SLCSD has declined to provide any special education services to H.S.

Both E.J. and H.S. have alleged concrete harms that affect them in their individual capacities. Accordingly, they have easily satisfied the injury in fact requirement of standing.

2) Redressability

In addition to showing an injury in fact, E.J. and H.S. must also establish that their injuries would likely be redressed by a favorable judicial decision. The individual plaintiffs argue that they have satisfied the redressability requirement because they are requesting an injunction that would require the SLCSD to make individualized placement decisions for them. E.J. and H.S. further contend that if the SLCSD is ordered to make individualized decisions, the district will likely allow them to receive special education services in their neighborhood schools, alleviating the harms alleged in their complaint.

Incorporating their Rule 12(b)(6) argument that the plaintiffs' action should be dismissed for failure to state a claim, the defendants argue that the individual plaintiffs' alleged injuries are not redressable because their claims fail as a matter of law. *See Urban v. Jefferson Cnty. Sch. Dist.*, 89 F.3d 720, 727 (10th Cir. 1996) ("[T]he IDEA does not give [students] a right to a placement at a neighborhood school."). But "[i]n most cases, a plaintiff's failure to state a claim under Rule 12(b)(6) does not deprive a federal court of subject-matter jurisdiction." *Brownback v. King*, 141 S. Ct. 740, 749 (2021). "[T]he absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, *i.e.,* the courts' statutory or constitutional *power* to adjudicate

5

the case." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998); *accord Warth v. Seldin*, 422 U.S. 490, 500 (1975) ("[S]tanding in no way depends on the merits of the plaintiff's contention that particular conduct is illegal . . . .").

"Dismissal for lack of subject-matter jurisdiction because of the inadequacy of the federal claim is proper only when the claim is 'so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy.'" *Steel Co.*, 523 U.S. at 89 (citation omitted). The defendants, however, do not argue that the plaintiffs' claims are so insubstantial or implausible as to deprive this court of jurisdiction. Indeed, the plaintiffs at least plausibly argue that the Tenth Circuit authorities cited by the defendants do not apply here because they seek an individualized determination rather than an absolute right to be educated in their neighborhood schools. Accordingly, the court finds that the plaintiffs' claims are not so devoid of merit to deprive the court of subject-matter jurisdiction.

In short, the defendants may not incorporate their 12(b)(6) arguments into the redressability element of the test for standing. The standard for redressability presumes that the plaintiffs will prevail on their claims and simply tests whether the court may grant relief that will address the claimed harm. *See Spokeo*, 578 U.S. at 338 (an injury is redressable if it "is likely to be redressed by a favorable judicial decision.") Because the injunctive relief requested by the individual defendants, should they prevail, would likely redress their alleged injuries, the court finds that E.J. and H.S. have met this standard.

Next, the defendants argue that H.S.'s injuries are not redressable because his parents declined to receive special educations services in a hub school and he has not alleged that his parents will consent to services in the future. But the objective of this action is to force the SLCSD to consider providing special education services to H.S. in his neighborhood school. The prayer

for relief clearly implies that H.S.'s parents would consent to services if provided to him in his local school.

Finally, the defendants contend that E.J.'s injuries are not redressable because she was in the sixth grade for the 2021-2022 school year and the complaint does not allege that the SLCSD employs the hub system for subsequent grade levels. This argument fails because it improperly conflates the standing doctrine with the mootness doctrine. "The plaintiff bears the burden to establish standing at the time the suit is filed, and if the defendant's offending conduct has ceased by that time, we dismiss for lack of redressability." *WildEarth Guardians v. Pub. Serv. Co. of Colorado*, 690 F.3d 1174, 1185 (10th Cir. 2012). "But if the offending conduct ceases after the suit is filed, the defendant must establish mootness by showing that its offending conduct 'could not reasonably be expected to recur.'" *Id.* at 1185–86 (citation omitted). Here, the defendants are asserting a mootness argument by suggesting that events that may have occurred after the complaint was filed could have mooted E.J.'s claims because she would no longer subject to the SLCSD's hub system. But the defendants cannot mount a mootness challenge by pointing to deficiencies in the complaint because plaintiffs need only plead facts showing standing at the time that they initiated the lawsuit. The defendants have the burden of producing evidence that subsequent events rendered E.J.'s claims moot. Because the defendants have not shouldered this burden, their mootness argument fails.

3) Conclusion

The court rejects the defendants' arguments that E.J. and H.S. do not have standing to sue. Thus, the court denies the defendants' motion to dismiss the individual plaintiffs' claims for lack of jurisdiction.

B.   The DLC

Unlike E.J. and H.S., the DLC was not directly affected by the SLCSD's hub system. The DLC argues that it nonetheless has standing to sue in its own name under two distinct theories: statutory standing and associational standing.[2] Although the DLC articulates these two theories as independent paths to standing, caselaw shows that they are intertwined.

First, the DLC argues that Congress has authorized it to sue on behalf of disabled individuals in Utah. The DLC alleges that it is a federally funded organization established under the Developmental Disabilities Assistance and Bill of Rights Act. Under this Act, Congress has authorized the DLC to "pursue legal, administrative, and other appropriate remedies or approaches to ensure the protection of, and advocacy for, the rights of [individuals with developmental disabilities] within [Utah] who are or who may be eligible for treatment, services, or habilitation." 42 U.S.C. § 15043(a)(2)(A)(i). The DLC asserts that this statutory grant of authority to pursue legal claims on behalf of disabled Utahns satisfies the standing requirement.

The DLC's statutory standing argument is only half-right. Although Congress may eliminate prudential standing rules by granting an express right of action, it may not abolish constitutional standing requirements. *Warth*, 422 U.S. at 501. Because the statutory authorization to sue does not resolve the question of whether the DLC has Article III standing to sue, it may not satisfy its burden to show that it has standing simply by referring to a congressional grant of a right to sue.

---

[2] The DLC also argues that it has organizational standing. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). Because the court finds that the DLC has associational standing, the court need not address this argument.

8

This statutory authorization, however, is relevant to the DLC's argument that it has associational standing. Under this theory,

> an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). The first and second requirements of the *Hunt* test are constitutional in nature, while the third is prudential. *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 555–56 (1996). Thus, where Congress has eliminated prudential barriers to standing by granting an organization the right to sue on behalf of others, the organization need only satisfy the first two requirements of the *Hunt* test rather than all three. *Id.* at 556–58; *Oregon Advoc. Ctr. v. Mink*, 322 F.3d 1101, 1112–13 (9th Cir. 2003) ("We hold that in light of the role Congress assigned by statute to advocacy organizations such as OAC [to sue on behalf of individuals with a mental illness], Congress abrogated the third prong of the *Hunt* test.").

To determine whether the DLC has associational standing in this case, the court need only decide (1) whether at least one individual within the scope of its statutory mandate has standing to sue[3] and (2) whether the interests at issue in the lawsuit are germane to the DLC's purpose. As

---

[3] In the *Hunt* case, the Supreme Court analyzed associational standing in the context of members of an organization. Of course, E.J. and H.S. are not members of the DLC in the sense that they or their parents chose to affiliate with it, contribute money to finance its operations, or vote for its leadership. But this is not fatal to the DLC's associational standing. The prohibition against suing to vindicate the rights of another is a prudential rule rather than a constitutional one. *United Food*, 517 U.S. at 557. Congress has eliminated this prudential obstacle to standing by authorizing the DLC to sue on behalf of disabled individuals who reside in Utah. *See Oregon Advoc. Ctr.*, 322 F.3d at 1110–12.

discussed above, E.J. and H.S. have Article III standing, satisfying the first requirement. And this lawsuit to require the SLCSD to make individualized determinations as to where to educate mentally disable children is germane to the DLC's mission of advocating for the rights of disabled Utahns. The SLCSD argues at some length that the DLC is unable to satisfy the third *Hunt* requirement: that the lawsuit may not require the participation of individual constituents. But, as discussed above, the DLC need not satisfy this third requirement. Because the DLC has satisfied the first two *Hunt* requirements, it has shown that it has standing to sue. The court denies the defendants' motion to dismiss it for lack of subject-matter jurisdiction.

## II.     EXHAUSTION OF ADMINISTRATIVE REMEDIES

Before filing a lawsuit that seeks the same relief available under the IDEA, a litigant must exhaust his or her administrative remedies. 20 U.S.C. § 1415(l); *Luna Perez v. Sturgis Pub. Sch.*, No. 21-887, 2023 WL 2575928, at *3 (U.S. Mar. 21, 2023). The plaintiffs exhausted their administrative remedies for the IDEA and ADA claims, but not for their Section 504 claim. Because their Section 504 claim seeks the same relief available under the IDEA, the plaintiffs concede that § 1415(l) requires them to exhaust their administrative remedies for this claim and that they failed to do so. "[J]udicial review is normally not available . . . until all administrative proceedings are completed . . . ." *Honig v. Doe*, 484 U.S. 305, 326–27 (1988). The plaintiffs argue, however, that their failure to exhaust is excused by the systematic failure exception to the exhaustion requirement.

"Parents may bypass the administrative process where exhaustion would be futile or inadequate." *Id.* at 327. "Administrative remedies are generally inadequate or futile where plaintiffs allege structural or systemic failure and seek systemwide reforms." *Ass'n for Cmty. Living v. Romer*, 992 F.2d 1040, 1044 (10th Cir. 1993). A challenge to a policy that affects all

students does not automatically excuse exhaustion under the systemic failure exception. *Hoeft v. Tucson Unified Sch. Dist.*, 967 F.2d 1298, 1304 (9th Cir. 1992). In order to be systemic, the alleged violation must be "so serious and pervasive that basic statutory goals are threatened." *Id.* The Tenth Circuit, for example, found that exhaustion was excused where the plaintiffs alleged that the entire special education system offered by the State of New Mexico was infirm. *N. M. Ass'n for Retarded Citizens v. New Mexico*, 678 F.2d 847, 851 (10th Cir. 1982).

In a case similar to this one, an advocacy group sued the Colorado Department of Education (CDE), claiming that the department had deprived disabled children of a free appropriate public education and appropriately individualized education programs because the department's policies "arbitrarily predetermine the duration of [extended school day] and [extended school year] services and use a single criterion to determine eligibility for [extended school year] services." *Romer,* 992 F.2d at 1043. The advocacy group failed to exhaust its administrative remedies. The Tenth Circuit held that the systematic failure exception did not excuse the exhaustion requirement because "[t]he violations alleged and relief requested in this case. . . do not target structural or due process concerns, but rather the effect of a single component of CDE's educational program on individual children's [individualized education programs]." *Id.* at 1044. "This is not the kind of systemic violation that renders the exhaustion requirement inadequate or futile, and framing a complaint as a class action challenge to a general policy does not convert it into one." *Id.* Moreover, allegations "that CDE's policies arbitrarily predetermine the duration of [extended school day] and [extended school year] services" did not trigger the systemic failure exception because these allegations "ultimately require[d] a determination as to whether any individual child was denied a free appropriate public education." *Id.* at 1045.

Other circuits have reached similar conclusions. The Ninth Circuit, for example, held that a plaintiff who brought a class action challenging a school district's policies regarding extended school year services for children with disabilities was required to exhaust administrative remedies. *Hoeft*, 967 F.2d at 1304. The court held that the alleged violations were not systemic in nature, reasoning that "[s]tructuring a complaint as a challenge to policies, rather than as a challenge to an individualized education program formulated pursuant to these policies . . . does not suffice to establish entitlement to a waiver of the IDEA's exhaustion requirement." *Id*. The Third Circuit came to the same conclusion in a case similar to this one. The plaintiffs in that case alleged violations of Section 504 because the school district "failed to individually consider . . . educational placements" of kindergarteners with special needs and instead used a "blanket rule" to place the students in special classes "without consideration of educating them in their 'neighborhood' school." *J.T. v. Dumont Pub. Schs*, 533 F. App'x 44, 49 (3d Cir. 2013) (unpublished). Because the claim "addresse[d] only one component of the school district's education program," and because resolving the claim required a "factually intensive inquiry into the circumstances of each individual child's case," the court held that the systematic exception did not apply. *Id.* at 54-55.

The plaintiffs argue that because their Section 504 claim challenges a systematic failure, exhaustion of administrative remedies is not required. Much like the plaintiff in *Romer,* the plaintiffs in this case assert that the SLCSD's predetermination of a child's placement into a hub school based on a single criterion (IQ score) is a systematic violation of rights that affects all students with a cognitive disability because it denies them individualized education programs. As in *Romer*, the systematic failure exception does not apply to the plaintiffs in this case because they "do not target structural . . . concerns, but rather the effect of a single component of [the SLCSD's] educational program on individual children's" individualized education programs. *Romer,* 992

12

F.2d at 1044. Additionally, the question of whether these predetermined hub placements deny the plaintiffs a free appropriate public education requires inquiry into the factual details of each particular child's case, further demonstrating that the systematic failure exception does not apply.

In short, the court finds that the plaintiffs do not qualify for the systematic failure exception to the exhaustion requirement. The court, therefore, dismisses the Section 504 claim without prejudice for failure to exhaust administrative remedies.

### III. RULE 12(b)(6) MOTION TO DISMISS

The defendants argue that the plaintiffs' remaining claims under the IDEA and the ADA should be dismissed under Rule 12(b)(6), which provides that a court may dismiss a complaint if it fails "to state a claim upon which relief can be granted." "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). When considering a motion to dismiss for failure to state a claim, a court "accept[s] as true all well-pleaded factual allegations in the complaint and view[s] them in the light most favorable to the plaintiff." *Burnett v. Mortg. Elec. Registration Sys., Inc.*, 706 F.3d 1231, 1235 (10th Cir. 2013).

The plaintiffs allege that the defendants violated their rights under the IDEA. The IDEA "offers States federal funds to assist in educating children with disabilities." *Endrew F. v. Douglas Cty. Sch. Dist. RE-1*, 580 U.S. 386, 390 (2017). "In exchange for the funds, a State pledges to comply with a number of statutory conditions. Among them, the State must provide a free appropriate public education . . . to all eligible children." *Id.* "A State covered by the IDEA must provide a disabled child with . . . special education and related services 'in conformity with the [child's] individualized education program' . . . ." *Id.* at 390–91 (second alteration in original) (quoting 20 U.S.C. § 1401(9)(D)). An individualized education program

> is a written statement of (1) the child's present performance level, (2) the goals and instructional objectives to be attained, (3) the specific educational services to be provided, (4) the child's needed transition services, (5) the projected dates for initiation and completion of such services, and (6) the criteria and procedures to be used to assess progress toward the instructional objectives.

*Urban ex rel. Urban v. Jefferson Cnty. Sch. Dist. R-1*, 89 F.3d 720, 722 (10th Cir. 1996).

Additionally, a child's free appropriate public education should be provided in the least restrictive environment necessary for the child to receive an appropriate education. 20 U.S.C. § 1412(a)(5). At the end of the day, the IDEA "guarantees a substantively adequate program of education to all eligible children." *Endrew F.*, 580 U.S. at 394. This requirement is satisfied if a child's individualized education program is "reasonably calculated to enable the child to receive educational benefits." *Id*. (citation omitted).

The plaintiffs also claim that the defendants violated the ADA. Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. "Regulations promulgated under the ADA forbid public entities such as [school districts] from denying a disabled person 'the opportunity to participate in services, programs, or activities that are not separate or different, despite the existence of permissibly separate or different programs or activities.'" *Urban*, 89 F.3d at 727.

The crux of the plaintiffs' claims under both the IDEA and the ADA is that the SLCSD's hub policy violates the protections afforded by these statutes because the district's placement decisions are not individualized. According to the plaintiffs, the IDEA and the ADA require the district to meaningfully consider providing special education services to disabled students in their

neighborhood schools when formulating their individualized education programs. The plaintiffs ask the court to order the SLCSD to reconsider their individualized education programs and determine whether they can receive special education services in their local schools.

The plaintiffs' claims are foreclosed by Tenth Circuit precedent. In *Murray ex rel. Murray v. Montrose County School District RE-1J,* 51 F.3d 921, 923–25 (10th Cir. 1995), a student with disabilities sued his school district under the IDEA, challenging the district's decision to move him from his neighborhood school to a school with a program for children with severe disabilities. The plaintiff argued that the least-restrictive-environment provision of the IDEA "includes a presumption that the [least restrictive environment] is in the neighborhood school with supplementary aids and services." *Id.* at 928. The Tenth Circuit disagreed and instead held that "the [least-restrictive-environment] mandate does not include a presumption of neighborhood schooling, and a school district accordingly is not obligated to fully explore supplementary aids and services before removing a child from a neighborhood school." *Id.* at 930.

The Tenth Circuit expanded on *Murray* in *Urban ex rel. Urban v. Jefferson County School District R-1*, 89 F.3d 720 (10th Cir. 1996). In that case, the school district placed a developmentally disabled student in school with a specialized program rather than his neighborhood school. *Id.* at 722–23. The student sued the school district, arguing that the IDEA and the ADA required the district to place him in his neighborhood high school because it was the least restrictive environment. *Id.* at 726. The Tenth Circuit ruled that "the IDEA does not give [the plaintiff] a right to a placement at a neighborhood school." *Id.* at 727. Instead, the IDEA only entitles a student to an appropriate education, and the school district "satisfies this requirement by providing personalized instruction with sufficient support services to permit the child to benefit educationally

15

from that instruction." *Id.* The court also held "that the ADA does not entitle [the plaintiff] to attend his neighborhood school." *Id.* at 728.

The plaintiffs argue that *Murray* and *Urban* do not defeat their claims because they do not assert an absolute right to receive special education services in their neighborhood school. Instead, they request an individualized placement decision that includes meaningful consideration of permitting E.J. and H.S. to receive special education services in their neighborhood school. *Murray*, however, forecloses this argument. In that case, the Tenth Circuit held that if a student's individualized education program calls for placement in another school in order to receive specialized services, a school district "is not obligated to fully explore supplementary aids and services before removing a child from a neighborhood school." *Murray*, 51 F.3d at 930. Because the school district did not have an obligation to consider proving supplementary services in a neighborhood school, the Tenth Circuit did not review the district's decision to educate the student in another school. *Id.* Similarly, *Urban* held that Section 504 "does not require a school district to modify its program in order to accommodate a single child in a neighborhood school, especially if that child is already receiving educational benefits in another environment." 89 F.3d at 728. Based on this analysis of Section 504 and that court's prior "holding in *Murray* that a disabled child does not have a right to attend her neighborhood school," the *Urban* court ruled "that the ADA does not entitle [a disabled student] to attend his neighborhood school." *Id.*

In sum, the holdings of *Murray* and *Urban* were not equivocal. These precedents do not leave the door open for this court to find that the IDEA or the ADA requires the SLCSD to make individualized determinations as to where special education services should be provided. If a school district has established a system to provide special education services in specific locations, it is not required to consider providing specialized services in neighborhood schools on a case-by-

16

case basis or to modify its program to accommodate the location preferences of individual students. The plaintiffs cannot plead around *Murray* and *Urban* by requesting an order requiring the SLCSD to meaningfully consider providing services in neighborhood schools rather than asserting a right to placement in a local school. Accordingly, the court finds that the plaintiffs' IDEA and ADA claims fail as a matter of law and grants the SLCSD's motion to dismiss these claims.[4]

## CONCLUSION

For the above-stated reasons, the court grants the defendants' motion to dismiss. The court dismisses the plaintiffs' Section 504 claim without prejudice for failure to exhaust administrative remedies. The court dismisses the plaintiffs' IDEA and ADA claims for failure to state a claim upon which relief can be granted.

DATED March 31, 2023.

BY THE COURT

_____
Jill N. Parrish
United States District Court Judge

---

[4] At oral argument, the plaintiffs argued that the SLCSD had also violated E.J.'s rights by not adequately integrating her with her nondisabled peers in her hub school. But E.J. has not raised this claim in the Amended Complaint or in the briefing on this motion to dismiss. The relief sought by E.J. in this action was limited to injunctive relief requiring the SLCSD to make an individualized determination as to whether to offer E.J. special education service in her neighborhood school. Accordingly, the court makes no determination regarding the adequacy of the services offered in the hub school. The court's dismissal of E.J.'s claims is without prejudice to her ability to challenge the adequacy of those services in a subsequent lawsuit.